**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANGELA RUGGIERO,<br>                    Plaintiff,<br><br>        v.<br><br>YAMAHA MOTOR CORPORATION,<br>U.S.A., JOHN DOE(s) A-Z as<br>manufacturer(s), designer(s) and/or<br>distributor(s) (fictitious name(s), i/j/s/a<br><br>                Defendants. | Civil Action No.: 1:15-cv-00049-JBS-KMW<br><br><br><br>MOTION DATE: September 19, 2016<br><br>**ORAL ARGUMENT REQUESTED** |

---

**BRIEF IN SUPPORT OF YAMAHA MOTOR CORPORATION, U.S.A.'S
MOTION TO EXCLUDE THE EXPERT TESTIMONY
OF WILLIAM F. KITZES AND FOR SUMMARY JUDGMENT**

---

**ANSA ASSUNCAO, LLP**
(A Pennsylvania Limited Liability Partnership)
Robert A. Assuncao
James S. Coons
Kenneth A. Burden
Two Tower Center Boulevard, Suite 1600
East Brunswick, New Jersey 08816
T: (732) 993-9850
F: (732) 993-9851

**THOMPSON COBURN LLP**
Richard A. Mueller, Esq. (*pro hac vice*)
One US Bank Plaza
St. Louis, Missouri 63101
T: (314) 552-6000
F: (314) 552-7000
*Attorneys for Defendant*
*Yamaha Motor Corporation, U.S.A.*

Dated: August 26, 2016

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

    I.   The Incident .............................................................................................................. 2

    II.   The PWC: 2009 Yamaha FZR WaveRunner ............................................................ 3

    III.  The 2009 Yamaha FZR Model WaveRunner Coordinated Warning System .................. 5

        A.   The Point-of-Sale Customer Checklist ................................................. 5

        B.   The On-Product Warning Labels ......................................................... 6

            1.   The Personal Watercraft Industry Uniform Warning Label ......................... 6

            2.   The Second Orifice Injury Warning Label ................................................... 8

        C.   The Owner's Manual ........................................................................ 8

        D.   The Riding Instructions Placard .......................................................... 10

        E.   The Basic Orientation Video .............................................................. 10

    IV.  Plaintiff's Prior Experience with the FZR and Product Warnings .................................. 11

    V.   Mr. Fimple's Prior Experience with the FZR and Product Warnings ............................ 12

    VI.  Plaintiff's Expert Willian F. Kitzes, J.D. .................................................................... 13

        A.   Educational and Professional Background ............................................ 13

        B.   The Work Performed, and Not Performed, By Mr. Kitzes ................................ 15

        C.   Mr. Kitzes' Opinions on Safety Warnings ........................................... 16

STATEMENT OF RELEVANT PROCEDURAL HISTORY ................................................... 17

ARGUMENT ..................................................................................................................... 17

    I.   Standard of Review ................................................................................................... 17

    II.   There Is Only One Claim Here:  Failure to Warn ......................................................... 18

III.  Mr. Kitzes' Expert Testimony Should Be Excluded Under *Daubert* .............................. 19

    A.   Mr. Kitzes Is Not Qualified To Offer His Opinions ........................................... 19

    B.   Mr. Kitzes' Testimony Is Unreliable ................................................................. 20

IV.  Plaintiff Needs Expert Testimony ........................................................................... 23

 V.  Summary Judgment is Appropriate Because Plaintiff
Cannot Establish Her Failure-To-Warn Claim as a Matter of Law ................................ 25

    A.   Plaintiff Lacks the Required Expert Testimony .................................................. 25

    B.   The Baseless "Move-It-To-The-Seat" Argument
Has Been Previously Rejected ........................................................................... 26

    C.   Plaintiff's Failure-To-Warn Claim Independently Fails
Because Plaintiff and Mr. Fimple Ignored the Warnings ................................... 26

CONCLUSION ............................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)............................................................................................17, 18

*Butler v. Acme Markets, Inc.*,
 89 N.J. 270 (1982) ...................................................................................................24

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)............................................................................................17, 18

*Crowley v. Chait*,
 322 F. Supp. 2d 530 (D.N.J. 2004) ..........................................................................21

*Daubert. Kolokowski v. Crown Equip. Corp.*,
 No. 05-4257, 2009 WL 2857957 (D.N.J. Aug. 27, 2009) .......................................25

*Daubert v. Merrell Dow Pharma. Inc.*,
 509 U.S. 579 (1993)...........................................................................1, 19, 21, 25

*Ebenhoech v. Koppers Indus., Inc.*,
 239 F. Supp. 2d 455 (D.N.J. 2002) .....................................................................21, 24

*Elcock v. Kmart Corp.*,
 233 F.3d 734 (3d Cir. 2000).....................................................................................19

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997) .................................................................................................21

*Heller v. Shaw*,
 167 F.3d 146 (3d Cir. 1999).....................................................................................21

*Henry v. St. Croix Alumina, Inc.*,
 572 Fed. App'x 114 (3d Cir. 2014)..........................................................................19

*Hickerson v. Yamaha Motor Corp., U.S.A.*,
 No. 8:13-cv-02311, 2016 WL 4123865 (D.S.C. July 29, 2016)..............................26

*Hickerson v. Yamaha Motor Corp., U.S.A.*,
 No. 8:13-cv-02311, 2016 WL 4367141 (D.S.C. Aug. 16, 2016)....................7, 8, 26

*Huszar v. Greate Bay Hotel & Casino, Inc.*,
 375 N.J. Super. 463 (App. Div. 2005) ......................................................................24

*Lauder v. Teaneck Volunteer Ambulance Corps*,
    368 N.J. Super. 320 (App. Div. 2004) .................................................................24

*Macri v. Ames McDonough Co.*,
    211 N.J. Super. 636 (App. Div. 1986) ...............................................................24

*Mahmood v. Narciso*,
    549 Fed. App'x 99 (3d Cir. 2013).......................................................................19

*McGarvey v. G.I. Joe Septic Serv., Inc.*,
    293 N.J. Super. 129 (App. Div.), *certif. denied*, 147 N.J. 263 (1996) ..............27, 28

*Milanowicz v. Raymond Corp.*,
    148 F. Supp. 2d 525 (D.N.J. 2001) ....................................................................23

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)...........................................................................21, 22

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994).................................................................................19

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008)...............................................................................21

*Rocco v. N.J. Transit Rail Operations, Inc.*,
    330 N.J. Super. 320 (App. Div. 2000) ...............................................................24

*Schneider ex rel. Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003)...............................................................................19

*Sprietsma v. Mercury Marine*,
    537 U.S. 51 (2002)...............................................................................................3

*Tawil v. Ill. Tool Works, Inc.*,
    Civil Action No. 15-8747, 2016 WL 4260791 (D.N.J. Aug. 11, 2016) ..........23, 24

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999)...............................................................................19

*Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*,
    982 F.2d 884 (3d Cir. 1992)...............................................................................18

**Statutes**

46 U.S.C. § 4302 ........................................................................................................................3

**Court Rules**

Fed. R. Civ. P. 56(a) .................................................................................................................17

Fed. R. Evid. 702 .................................................................................................................19, 26

**Other Authorities**

ABYC, *About ABYC*, http://abycinc.org/?page=About (last visited Aug. 22, 2016) ...................14

NMMA, *Membership*, https://www.nmma.org/membership
    (last visited Aug. 22, 2016).......................................................................................................14

U.S. Coast Guard, *NBSAC*, http://www.uscgboating.org/NBSAC/index.php
    (last visited Aug. 23, 2016)......................................................................................................7, 8

## INTRODUCTION

Defendant Yamaha Motor Corporation, U.S.A. ("Defendant" or "YMUS") respectfully submits this brief in support of its Motion to exclude the opinions of Plaintiff's expert, William F. Kitzes, and for Summary Judgment.[1]

This is a failure-to-warn products liability action involving Thomas Fimple's 2009 Yamaha FZR WaveRunner personal watercraft ("FZR"). Plaintiff Angela Ruggierio ("Plaintiff") was a passenger on the FZR being operated by her boyfriend, Mr. Fimple, when she fell off and suffered a water intrusion injury to her rectum.[2] The FZR has a coordinated warning system that advises users of the potential risk of a water intrusion injury (at multiple times and places) and how to avoid that risk. The warnings advise all riders on the FZR to wear wetsuit bottoms or equivalent protective clothing, which will prevent water intrusion injuries. Plaintiff was not wearing protective clothing at the time of the accident; she was wearing a sheer two-piece bathing suit.

In support of her failure-to-warn claim, Plaintiff offers William F. Kitzes as an expert in product warnings. Defendant moves to exclude Kitzes under *Daubert v. Merrell Dow Pharma. Inc.,* 509 U.S. 579 (1993) because: (a) he is not qualified to express the opinions he offers (he is a former lawyer); (b) his opinions are not reliable; (c) his "method" to derive these opinions is not scientific; and (d) his generic views about warnings are not "helpful" to the jury. The industry-wide uniform warning label ("Uniform Label") on the FZR was cooperatively

---

[1]      Unless otherwise specified, all citations to exhibits herein refer to the exhibits attached to the August 26, 2016 Declaration of Robert A. Assuncao.

[2]      Water intrusion (or "orifice injuries") are rare events that have been reported to be associated with certain activities like water slides and water skiing. (Ex. 8, at 11-12). It is also possible to sustain an orifice injury when falling off a personal watercraft ("PWC") at certain speeds or from exposure to the water from the jet nozzle. *Id.*

developed and reviewed by the United States Coast Guard ("USCG"), the Boating Safety Advisory Council ("BSAC"), and the National Association of State Boating Law Administrators ("NASBLA"). Kitzes offers opinions to criticize this industry-wide safety initiative without any testing or other empirical evidence. He cites to no academic or industry literature as support for his critiques. His opinions should be excluded.

Lacking admissible expert testimony to establish a defective warning, Plaintiff's claim fails as a matter of law and Defendant is entitled to summary judgment.

## STATEMENT OF FACTS

### I.     The Incident

On June 30, 2012, Plaintiff Angela Ruggierio was injured when she fell off a 2009 Yamaha FZR WaveRunner PWC just off of Brigantine Township Beach, in the Absecon Inlet. (Ex. 1, 66:18-20, 87:20 to 88:8, 97:22 to 98:14, 121:20 to 122:6; Ex. 29). Plaintiff's boyfriend, Thomas Fimple, was the owner and operator of the FZR at the time of the incident. (Ex. 1, 93:13 to 94:4). When she fell off the FZR, Plaintiff suffered a rectal laceration. (Ex. 1, 143:18 to 144:3). She was wearing a sheer two-piece bathing suit when the incident occurred; she was not wearing wetsuit bottoms or other protective clothing:



(Ex. 1, 170:2 to 171:7 & Depo. Ex. 10; Ex. 2, 143:12 to 144:2; Ex. 14).

At the time of the incident, Fimple and Plaintiff were accompanied by a friend, Salvatore Chiaradonna, who was operating another 2009 Yamaha FZR model PWC.  (Ex. 3, 15:14-20, 39:4-19).  After launching from a boat ramp in either Brigantine or Corson's Inlet, the two PWCs rode to Absecon Inlet, intending to meet friends at the Brigantine Township Beach.  (Ex. 1, 88:18-25, 103:6-11; Ex. 2, 95:5-9; Ex. 3, 33:4-14).   In the inlet and near the beach, they encountered a large boat.  (Ex. 1, 103:16-22, 106:9 to 107:16; Ex. 2, 119:24 to 123:1).  This boat was accelerating to reach planning speed, and it was throwing a wake up to two feet high.  (Ex. 1, 103:6-15, 112:9 to 113:8; Ex. 2, 119:24 to 123:1).

While the testimony is inconsistent in several respects, the following facts are clear. After idling in the inlet, both PWC accelerated towards the boat's wake.  (Ex. 2, 123:17 to 125:25; Ex. 3, 48:4 to 50:18, 52:9-18).  Plaintiff was looking off to her right when Mr. Fimple accelerated, and she was only lightly holding on to him.  (Ex. 1, 103:6-15, 118:25 to 121:9). Contrary to their practice, Mr. Fimple did not advise Plaintiff he was going to accelerate.  (Ex. 1, 140:21 to 141:11; Ex. 2, 123:17 to 125:25).  The FZR quickly reached a speed of 30 to 35 miles-per-hour as it approached or reached the boat wake, and Plaintiff fell off the back of the FZR. (Ex. 2, 113:3-19; Ex. 3, 48:4 to 50:18, 59:8-13, 66:7-12; Ex. 29).

## II.      The PWC: 2009 Yamaha FZR WaveRunner

The subject 2009 Yamaha FZR WaveRunner is a high-speed, two-person, water jet-propelled, recreational boat.  (Ex. 5, at 2-3).  It is designated by the USCG as a Class A inboard boat.  (Ex. 8, at 8).  The USCG is the sole federal agency that sets design standards for all recreational boats in the United States, pursuant to the Federal Boat Safety Act of 1971.  *See* 46 U.S.C. § 4302; *Sprietsma v. Mercury Marine*, 537 U.S. 51, 57-58 (2002).  Pursuant to that Act,

the USCG has established an exemption process, whereby it reviews the designs of recreational boats, like PWCs, and grants exemptions if there is no adverse effect on recreational boating safety.  The FZR was granted such an exemption.  (Ex. 8, at 8).



The PWC was designed by Yamaha Motors Company, Ltd. ("YMC") in Japan and manufactured by Yamaha Motor Manufacturing Corporation of America ("YMMC") in Georgia. Neither YMC nor YMMC is a party to this action.  (ECF No. 1-1).  Defendant Yamaha Motor Corporation, U.S.A. ("YMUS"), a California Corporation, purchased the craft from YMMC and sold it at a wholesale level to a New Jersey dealer, Deptford-Honda/Yamaha.  Mr. Fimple purchased the FZR from Deptford-Honda Yamaha on July 19, 2009, and had owned it for nearly three years at the time of the incident.  (Ex. 2, 54:16 to 55:17).

Mr. Fimple purchased this PWC because it was the "fastest" one made by Yamaha.  (Ex. 2, 59:16 to 18).  After he purchased it, he proceeded to make a number of aftermarket modifications to the product with the intent of making it go even faster.  (Ex. 2, 59:21 to 63:6). These modifications included a free flow intake, free flow exhaust, a pump seal case, a splash guard, an impeller, an intake grate, and a ride plate.  *Id.*  Mr. Fimple has ridden the craft at speeds approaching 68 to 70 miles-per-hour, and jumped wakes and waves.  (Ex. 2, 69:20 to 70:20).  He has gone airborne on the PWC, up to two to three feet out of the water, when doing so.  *Id.*

Prior to the accident, Mr. Fimple installed a decorative decal wrap on the subject FZR that covered all the original equipment warning labels on the vessel (except for the Uniform Label located on the glove box door below the handlebars).  Specifically, the decal wrap covered the second orifice injury warning label located behind the seat over the rear boarding platform of the FZR.  (Ex. 2, 76:3 to 77:17, 87:4-8; Ex. 12).

## III.   The 2009 Yamaha FZR Model WaveRunner Coordinated Warning System

The FZR has an interconnected warnings system, which provides multiple warnings and information regarding the risk of orifice injuries.  (Ex. 10, at 4-5).  This warnings system includes on-product warning labels, the product's Owner's Manual, a Riding Practice Guide, a waterproof Riding Instructions Placard, a Basic Orientation Video, and other safety information provided by the dealer at the point of sale.  *Id.*

### A.   The Point-of-Sale Customer Checklist

Every Yamaha WaveRunner is accompanied by a Set-Up and Predelivery Checklist, which is used by the selling dealer to, among other things, confirm that all safety related information is delivered to the customer.  (Ex. 11).  At the time of product delivery, the checklist is signed by the customer to confirm that information about the safety and operation of the vessel has been received from the selling dealer.  *See id.*   The checklist references the safety information that accompanies the vessel, including:  (1) "All warning labels reviewed"; (2) "Instructional material received"; (3) "Need for protective apparel discussed (wet suit, PFD, etc.)"; (4) "Basic orientation videotape received"; and (5) Riding instruction card received".  *Id.* The checklist specifically requires the dealer to advise the purchaser of the need to wear protective apparel when riding the FZR.  *Id.*  Mr. Fimple signed this checklist when he purchased his FZR, acknowledging that each of the above safety information items was provided to him,

5

and verified "I have reviewed the customer checklist and understand the points presented.  I have visually inspected the unit and found no defects."  *Id.*

Mr. Fimple does not dispute that he was told of the need to wear protective clothing.  (Ex. 2, 64:5-24, 67:5 to 68:5).

**B.      The On-Product Warning Labels**

**1.      The Personal Watercraft Industry Uniform Warning Label**

At the time it was sold to Mr. Fimple, the FZR had two warning labels affixed to the watercraft that specifically addressed the risk of orifice injuries and the need to wear protective clothing.  These are located at the handlebars (on the lid of the glove box) and at the rear of the craft (next to the rear boarding deck).  These locations are designated as numbers one and four, respectively, in the diagram below.  (Ex. 15, at 5).

 

This label on the glove box specifically states:



(Ex. 10, at 7). [3]

The label on the glove box is the Uniform Label used by every PWC manufacturer in the United States.  *See Hickerson v. Yamaha Motor Corp., U.S.A.*, No. 8:13-cv-02311, 2016 WL 4367141 at *4 (D.S.C. Aug. 16, 2016).  It was developed by the PWC industry in conjunction with the USCG and safety consultants retained by the USCG.  (*Id.*; *see also* Ex. 10, at 14-15).  It was presented to and approved by BSAC[4] and NASBLA.  *Id.*  The Uniform Label was adopted in 2001 and has been used by every PWC manufacturer ever since.  *Id.*  The methodology and resulting warnings have been peer reviewed by the human factors community through a series of published journal articles and a presentation at the Human Factors and Ergonomics Society Annual Meeting.  *Id.*  Among the entities providing input during this cooperative process were

---

[3]     The Uniform Label also states: (1) **RIDE WITHIN YOUR LIMITS AND AVOID AGGRESSIVE MANEUVERS** to reduce the risk of loss of control, ejection, and collision; (2) **DO NOT APPLY THROTTLE WHEN ANYONE IS AT REAR OF PWC**.  Water and/or debris exiting jet thrust nozzle can cause severe injury; (3) **READ AND FOLLOW OWNER'S MANUAL;** and, Do not jump wakes or waves.  (Ex. 10, at 7; Ex. 15, at 6).

[4]     The BSAC was established by the Federal Boat Safety Act of 1971 and is designated to advise the USCG on recreational boating safety.  *See* U.S. Coast Guard, *NBSAC*, http://www.uscgboating.org/NBSAC/index.php (last visited Aug. 23, 2016).

the USCG's Office of Boating Safety, the BSAC, and industry representatives.  *Id.*; *Hickerson*, 2016 WL 4367141 at *4.[5]

### 2.     The Second Orifice Injury Warning Label

An additional warning label at the rear of the PWC also alerts riders to wear wetsuit bottoms (or similar protective apparel) to avoid orifice injuries.  The label is affixed behind the seat above the boarding platform.  It warns:



(Ex. 10, at 8).  Prior to the date of the accident, Mr. Fimple installed a decorative decal wrap around the body of the PWC, which completely covered and obscured the second, rear warning label.  (Ex. 2, 87:4-8; Ex. 12).

### C.    The Owner's Manual

The Owner's Manual for the FZR contains detailed instructions and warnings regarding the proper and safe use of the product.  (See Ex. 15).  These safety messages are contained within the instructions and highlighted through specific formatting.  The Owner's Manual also

---

[5]     The ease of reading and comprehension of the Uniform Label was evaluated in several locations nationwide, including New Jersey.  (Ex. 10, at 14-15).  The evaluation demonstrated that all safety messages about orifice injuries and how to avoid this risk were well understood. *Id.*   One hundred percent of respondents correctly understood the statements "wear wetsuit bottom," "wear clothing that provides equivalent protection,""normal swimwear is not adequate," and the phrases "severe internal injuries," "into body cavities," and "falling into water or being near jet thrust nozzle."  The standardized warnings, and the extensive evaluation process establish a valid, empirical basis for concluding that the language and presentation of this information is reasonable and appropriate to effectively communicate with PWC riders.  *Id.*

provides illustrations of the on-product warnings.  (Ex. 15, at 6, 7, 12, 61).  It instructs all riders

to read the manual and warning labels **before** riding the PWC.  (Ex. 15, at front cover).

Warnings about the potential risk of orifice injuries and the need to wear protective

clothing are found throughout the Owner's Manual.  (Ex. 15, at 6, 7, 12, 61, 62, 64).   For

example, the Safety Information section of the manual warns:



• Wear protective clothing. Severe internal injuries can occur if water is forced into body cavities as a result of falling into the water or being near the jet thrust nozzle. Normal swimwear does not adequately protect against forceful water entry into the rectum or vagina. All riders must wear a wetsuit bottom or clothing that provides equivalent protection. Such clothing includes thick, tightly woven, sturdy and snug-fitting apparel such as denim, but does not include spandex or similar fabrics, like those used in bicycle shorts.

1  USCG approved PFD
2  Wetsuit bottom

(Ex. 15, at 12).

The Operation instructions provide the same written warning as the one found in the

Safety Information section.  (Ex. 15, at 61).  On the next page, in the subsection for "Riding with

a passenger", the manual instructs:   "The passenger must always wear a U.S. Coast Guard

approved PFD **and a wetsuit bottom or equivalent**."  (Ex. 15, at 62 (emphasis added)).

In the Operation subsection titled "Boarding with a passenger," the manual warns

"Severe internal injuries can occur if water is forced into body cavities as a result of being near

the jet thrust nozzle.  Do not apply throttle until the passenger is seated with both feet on the floor of the footwell and is securely holding on to the operator."  (Ex. 15, at 64).

**D.      The Riding Instructions Placard**

The laminated Riding Instructions Placard that accompanied the PWC is waterproof, so it can be kept with the vessel for easy reference.  (Ex. 2, 54:7-12).  The very first panel of the placard warns:



(Ex. 10, at 13).

**E.      The Basic Orientation Video**

The orientation video provided to Mr. Fimple when he purchased the FZR also communicates relevant safety information.  It directs users to read the Owner's Manual and

explicitly warns viewers about the potential for orifice injuries and the necessity of wearing protective clothing, such as wet suit bottoms.  (Ex. 10, at 14).[6]

## IV.  Plaintiff's Prior Experience with the FZR and Product Warnings

Plaintiff had experience riding with Mr. Fimple before this accident.  (Ex. 1, 32:23 to 33:22).  She began riding as a passenger on Mr. Fimple's FZR in 2011.  (Ex. 1, 37:6-12).  She and Mr. Fimple had a system whereby she would hold on to him (Ex. 1, 47:3-15, 48:24 to 49:10) and, if he stopped, he would tell her before he was going to accelerate.  (Ex. 1, 84:17 to 85:13).  Mr. Fimple does not dispute that the dealer told him of the need to wear protective clothing when riding the FZR.[7]  But he never told Plaintiff about this requirement (Ex. 1, 48:9-20), and he never asked her to review any of the materials or the on-product warnings on the craft.[8]  According to Plaintiff, even though she had gotten on and off the craft many times, she never read any of the warnings on the FZR.[9]  Mr. Fimple never talked to her about this risk of injury.  (Ex. 1, 58:14 to 60:2; Ex. 2, 81:1 to 19).  Plaintiff also never read the second warning at the rear of the craft.  (Ex. 1, 62:8-17, 63:22 to 64:19).

---

[6]    YMUS will provide this video at the Court's request.

[7]    *See* Exhibit 11, the Customer Checklist, which he signed when he acquired the craft.

[8]    Mr. Fimple never asked or directed Plaintiff to read the Owner's Manual, and Plaintiff never read the Owner's Manual of her own accord.  (Ex. 1, 49:13 to 50:7, 73:8 to 79:18; Ex. 2, 87:25 to 91:17).  Plaintiff also did not read the Riding Safety Handbook, the laminated Riding Instructions Placard, and did not view the Basic Orientation Video provided to Mr. Fimple at the time of sale.  (Ex. 1, 49:17-20, 79:25 to 81:13; Ex. 2, 83:5 to 20).

[9]    From the first time she rode on Mr. Fimple's FZR to the date of the accident, it never occurred to Plaintiff that she should read the warning labels on the FZR.  (Ex. 1, 71:25 to 72:7).  Plaintiff claims that before the accident, she never read the main warning label affixed below the handlebars of the FZR.  (Ex. 1, 55:25 to 56:12).

### V.     Mr. Fimple's Prior Experience with the FZR and Product Warnings

Prior to Plaintiff's accident, Mr. Fimple never reviewed the Owner's Manual for the FZR. (Ex. 2, 11:2-6).  He did not review any of the other cautionary materials provided by the dealer at the time of its purchase.  (Ex. 2, 11:7-13).  Nor did he review the Orientation Video regarding the safe operation of the FZR.  (Ex. 2, 11:14-21).  Mr. Fimple has never reviewed safety information for any PWC he has owned or used.  (Ex. 2, 11:24 to 12:9).[10]

Mr. Fimple first learned to operate a PWC in 1993, when he rode a 1993 WaveRunner III and later a 1995 WaveRunner III, both owned by his aunt.  (Ex. 2, 35:18 to 36:15, 47:5-7).  He never read the Owner's Manuals for either of these vessels.  (Ex. 2, 36:2-24).  He also never read the on-product safety labels on either watercraft.  (Ex. 2, 36:25 to 37:3).

Mr. Fimple has owned two personal watercraft:  a 2003 Yamaha WaveRunner and the subject FZR.  (Ex. 2, 43:15-23).  When he purchased the FZR, Mr. Fimple received the Owner's Manual, a Riding Practice Guide, a waterproof Riding Instructions Placard, and a thick plastic Ziploc bag to store the information.  (Ex. 2, 51:17 to 53:14).  He did not keep any of these items with the FZR.  (Ex. 2, 53:24 to 54:6).

Mr. Fimple never read the on-product safety labels on either of the PWC he owned.  (Ex. 2, 45:2-6).  Mr. Fimple admits that he never complied with the on-product warning labels for any PWC he owned or operated:

---

[10]     Since approximately 2000, Mr. Fimple has received formal training in safety and hazard communications, and the proper use of heavy equipment and chemicals at his workplace, the Merchantville Pennsauken Water Commission.  (Ex. 2, 25:9 to 27:12).  Mr. Fimple understands that warnings on equipment provide necessary precautions to prevent serious injury or death. (Ex. 2, 32:10 to 20).  Despite this training, Mr. Fimple did not read warning labels or instructions for products or equipment he owned or used.  (Ex. 2, 32:24 to 33:7).

> Q:      Why didn't you read any of those labels?

> A:      . . . Everything that I've been taught, I've been taught through my uncle, who was a boater, my grandfather, who was a boater, my aunt, who is a boater, their entire lives. So them teaching me physically how to properly do things, I didn't feel those warning labels would affect me at all because they've taught me all the safety I needed to know. . . . **And those warning labels, I just look at them and say that's something that I already probably know, and just kind of blow them off**.

(Ex. 2, 45:7 to 46:3 (emphasis added)).

## VI.   Plaintiff's Expert Willian F. Kitzes, J.D.

Plaintiff's sole expert witness, William F. Kitzes, J.D., has been retained to offer testimony regarding the adequacy of the safety warnings—related to orifice injuries—on the FZR.

### A.      Educational and Professional Background

Mr. Kitzes holds a bachelor of the arts degree from the University of Wisconsin, where he majored in history and minored in political science.  (Ex. 16).  After graduating, Mr. Kitzes went to the Washington College of Law at American University, where he received a juris doctorate degree.  *Id.*  Mr. Kitzes has no degrees in engineering, psychology, communications theory or any science field whatsoever.  *Id.*

Prior to entering the litigation business, Mr. Kitzes spent six years working as an attorney for the Consumer Product Safety Commission ("CPSC") in Washington, D.C.  *Id.*  The CPSC has no regulatory authority over PWC.  (Ex. 19, 43:15 to 19).  That limited experience occurred over 30 years ago.  Since 1983, Mr. Kitzes has run Consumer Safety Associates, LLC, a consulting business, from his home office in Boca Raton, Florida.  (Ex. 16; Ex. 19, 26:10 to 28:12).  Mr. Kitzes and his wife are the only employees in this consulting business.  *Id.*  He has no laboratory, no staff, and no facility for testing.  (Ex. 19, 21:14 to 22:15).

13

Mr. Kitzes does not have a degree in industrial safety management.  (Ex. 19, 75:12-22).
He is not a member of the Society of Automotive Engineers ("SAE"), the organization that
developed standards for PWC, and he has never attended an SAE meeting.  (Ex. 19, 76:7-16).
He has no expertise in accident reconstruction or boat design.  (Ex. 19, 63:8-19).  Mr. Kitzes has
never worked with or communicated with any employee of the USCG, the regulatory agency
tasked with setting design and safety standards for PWC.  (Ex. 19, 76:17 to 77:1).  He has never
attended a meeting for the National Marine Manufacturers Association ("NMMA")[11] or the
American Boat and Yacht Council ("ABYC")[12], organizations that also set standards for
recreational boating.  (Ex. 19, 77:2-18).

Mr. Kitzes has never owned a PWC and has only ridden PWC four times in his life.  (Ex.
19, 31:4-8).  He has not ridden a PWC in over ten years.  (Ex. 19, 32:12-14).  He has never
ridden this FZR model.  (Ex. 19, 80:17 to 82:8, 83:9-18).

Mr. Kitzes claims that he is an expert in warnings and hazard communications generally.
(Ex. 16, at 7).  But numerous federal and state courts across the country have disqualified Mr.
Kitzes as an expert and stricken his opinions on product warnings.[13]

---

[11]     The NMMA is the largest trade organization in the recreational boating industry, which
represents the industry to policymakers, the media, and the public.  *See* NMMA, *Membership*,
https://www.nmma.org/membership (last visited Aug. 22, 2016).

[12]     The ABYC is a non-profit, member organization that develops voluntary safety standards
for the design, construction, maintenance, and repair of recreational boats.  ABYC, *About ABYC*,
http://abycinc.org/?page=About (last visited Aug. 22, 2016).

[13]     *See* Ex. 23 (listing cases excluding testimony of Mr. Kitzes); Ex. 24, at *6 ("In
summation, all of the opinions reflected in Mr. Kitzes report are excluded."); Ex. 25, at 17-18
("It is clear, therefore, that Kitzes has employed no methodology, much less a reliable
methodology, to reach his causation conclusion."); Ex. 25, at 16 ("In essence, it appears that
Kitzes merely looked at other manufacturers' warnings and decided that since these warnings
were on other boards, such warnings should have been used here.  He has not offered any data to
support why these warnings were placed, such as the research done, the analysis or studies
performed, etc."); Ex. 26, at 3 ("Truth be told, the bulk of Kitzes' expertise may now lie in being

## B.   The Work Performed, and Not Performed, By Mr. Kitzes

The only work that Mr. Kitzes has done in this case is review the materials that were provided to him by plaintiff's counsel and cite to some generic warnings standards.   He has issued two reports.  (Ex. 19, 21:14 to 22:15).  Mr. Kitzes did not visit the accident location or any other location associated with Plaintiff's use of the FZR.  (Ex. 19, 13:9-11).  He did not inspect the subject FZR or an exemplar FZR; he relied entirely on photographs of the FZR and its on-product warnings that were provided to him by counsel.  (Ex. 19, 21:14 to 22:15).  Mr. Kitzes has never seen the subject PWC or an exemplar in operation.  (Ex. 19, 80:17 to 82:8, 83:9-18).  And he never spoke with Plaintiff, Mr. Fimple, or Mr. Chiaradonna to discuss the accident.  (Ex. 19, 13:12-16).

Mr. Kitzes conducted no testing (such as consumer focus group testing) to evaluate the readability and fluency of the FZR on-product safety warnings, or the location of the on-product safety warnings.  (Ex. 19, 21:14 to 22:15).  Since he has never seen the subject FZR or an exemplar, he has not performed any testing to determine how visible the on-product warnings are to operators and passengers during the process of trailering, preparing and launching the PWC, placing items into and removing items out of the glove box (where the Uniform Label is located), and boarding the PWC.  (Ex. 19, 21:14 to 22:15; Ex. 5, at 24 & Report Ex. A).

---

an "expert."  His litigation resume is most remarkable for its length, and the diversity of subjects on which Kitzes has opined suggests that he is either a Renaissance man of the highest order or a specialist in not much at all."); Ex. 26, at 6 ("Even now, [Kitzes] has done no testing, implemented no designs, performed no studies.  His preparation consists wholly of the review of 26 documents; mere access to documents that might be excluded as hearsay by a court does not an expert make."); Ex. 27, at 9-10 ("[Kitzes'] opinion is a pure conclusion, however, since Kitzes has offered no tests to support it and no manner to allow it to become tested.  An untested hypothesis is inherently suspect.").

### C.      Mr. Kitzes' Opinions on Safety Warnings

Mr. Kitzes does not criticize the content of the two warning labels on the FZR that warn of the potential risk of orifice injuries and how to avoid that risk.  (Ex. 19, 49:19 to 50:8 ("I'm not going to criticize the wording of the uniform label")).  Rather, Mr. Kitzes opines that the safety warnings are inadequate because the Uniform Label on the glove box of the FZR uses white letters on a black background instead of black letters on a white background.  (Ex. 19, 49:19 to 50:8).  He opines that this configuration is less "fluent" than black letters on a white background.  (Ex. 19, 49:19 to 50:8, 55:8-19).  Mr. Kitzes cites to no article on hazard communications to support this conclusion.  (Ex. 19, 51:14 to 53:19).  A vague reference to "documentation on fluency" in the advertising field is the only support Mr. Kitzes can muster (without providing a reference or citation).  (Ex. 19, 51:14 to 53:19).  Nor can he state that white text on a black background is not readable.  (Ex. 19, 55:8-19).  He merely opines that a PWC rider is more likely to read a label, and read it quicker, if the warning is made with black letters on a white background.  (Ex. 19, 55:8-19).  No support is offered for this statement, and no testing was performed to confirm his opinion.  (Ex. 19, 21:14 to 22:15, 51:14 to 53:19).

Mr. Kitzes also opines that "the spacing could have been better" on the Uniform Label. (Ex. 19, 66:7-16).  But he does not explain what is wrong with the spacing, or how it could be improved over the Uniform Label that was accepted by the USCG and the PWC industry following the extensive process undertaken to develop standardized safety instructions.  (Ex. 19, 66:7-16).

Mr. Kitzes' second opinion is that the additional warning label related to orifice injuries, which is located above the rear deck, and which Mr. Fimple covered before the accident, is inadequate because of its location.  (Ex. 19, 48:15 to 49:16).  Mr. Kitzes says that it should be

placed in front of the passenger and behind the operator.  The only possible location Mr. Kitzes could suggest is somewhere near the middle of the seat itself.  (Ex. 19, 48:15 to 49:16).

## STATEMENT OF RELEVANT PROCEDURAL HISTORY

The case was originally filed in state court and was removed. (ECF No. 1, 1-1).  Prior to bringing this action, Plaintiff filed an insurance claim against Mr. Fimple, asserting that he is responsible for her injuries.  (Ex. 1, 172:22 to 173:1, 174:1-5).  The claim was settled for $98,000.  (Ex. 1, 173:18 to 174:22).

On December 21, 2015, Plaintiff served Mr. Kitzes' December 7, 2015 expert report, ahead of the January 22, 2016 deadline.  (Ex. 17; Ex. 18; ECF No. 17).  All depositions of proposed expert witnesses were to be completed by June 20, 2016.  (ECF No. 20).  YMUS deposed Mr. Kitzes on February 4, 2016.  (Ex. 19).  On July 7, 2016, Plaintiff served YMUS with the July 6, 2016 supplemental report of Mr. Kitzes.  (Ex. 20; Ex. 21).  YMUS objected to this untimely expert report (Ex. 22) and, on August 22, 2016, Plaintiff and YMUS agreed to resolve this issue by striking certain portions of Mr. Kitzes' supplemental report.  (ECF No. 23).  These are the only two reports of Mr. Kitzes at issue in this motion.

## ARGUMENT

### I.    Standard of Review

A plaintiff's cause of action must be dismissed if "there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue is genuine if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if, under the governing substantive law, a dispute about the fact might affect the outcome of the

suit. *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

To withstand a properly supported motion for summary judgment, the nonmoving party must identify the specific facts and affirmative evidence that contradict those offered by the moving party. *Id.* at 256-57. A nonmoving party may not rest on mere allegations, general denials, or vague statements. *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and entitles the moving party to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

## II.     There Is Only One Claim Here:  Failure to Warn

Plaintiff's Complaint is comprised of Four Counts:  (1) strict products liability against YMUS for design defect and a failure to warn; (2) negligence against YMUS for inadequate instructions and warnings for the FZR; (3) a strict products liability claim identical to the First Count but directed against fictitious individuals; and (4) a negligence claim identical to the Second Count but directed against fictitious individuals.  Plaintiff's design defect claim under the First Count has been abandoned.  Plaintiff has restricted this action to a failure-to-warn theory both in discovery responses and in statements made by counsel on the record during case management conferences.  (Ex. 6, 62:16-63:22; Ex. 28, at Response No. 9).  The Second Count for negligence is statutorily barred by the New Jersey Products Liability Act and should be dismissed as a matter of law.  The Third and Fourth Counts should be dismissed because no individual or entity has been substituted for the fictitious entities named therein.  Thus, and as a

threshold matter, only the First Count—under a failure-to-warn theory—is left for adjudication on this Motion.

**III.    Mr. Kitzes' Expert Testimony Should Be Excluded Under *Daubert.***

Pursuant to *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993), expert testimony must meet three specific requirements to be admissible under Federal Rule of Evidence 702:  (1) the witness must be sufficiently qualified; (2) the testimony must be reliable; and (3) the testimony must assist the trier of fact.  *Schneider ex rel. Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *Henry v. St. Croix Alumina, Inc.*, 572 Fed. App'x 114, 117 (3d Cir. 2014).  The party offering the expert bears the burden of meeting the *Daubert* criteria.  *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999); *Mahmood v. Narciso*, 549 Fed. App'x 99, 102 (3d Cir. 2013).

**A.    Mr. Kitzes Is Not Qualified To Offer His Opinions.**

"Before an expert witness may offer an opinion pursuant to Rule 702 he must first be qualified by virtue of specialized expertise."  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).  Practical experience or academic training may provide the necessary specialized knowledge.  *Id.*  The Third Circuit interprets this requirement liberally, but, at a minimum, the proffered expert witness must possess skill or knowledge greater than the average layman.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).

Mr. Kitzes' educational background provides no specialized knowledge in PWC warnings.  He holds degrees in history and law.  His years of testifying in courts do not qualify him as an expert in hazard communications.  Nor do his 5-6 years working in the CPSC law department (over 30 years ago) qualify him.  The CPSC is not the USCG, and the USCG is the only relevant federal agency here.  Mr. Kitzes is not an engineer and has no training in industrial safety engineering.  He has no expertise in PWC design or operation.  Mr. Kitzes has never

19

worked within the PWC industry and has no affiliation with any of the organizations that promulgate or enforce regulations or standards governing recreational boating or the operation of PWCs.  He has never designed a warning system for a PWC, and never owned a PWC.  He has never appeared before or participated in any association related to PWCs or recreational boats (e.g., NASBLA, BSAC, SAE—PWC Committee, ABYC or NMMA).

Mr. Kitzes does not have sufficient practical experience to opine on the adequacy of PWC warning systems.  He worked as an attorney within the CPSC for a handful of years prior to starting a consulting business.  He has some background related in the CPSC's procedures (e.g., CPSC regulations and CPSC's recall process), but none of that relates to the USCG or its regulations or processes.  (Ex. 16). Nor does it appear to relate to the testing and analysis of human abilities, human limitations, and other human characteristics that are relevant to the design of warning systems.

It comes as no surprise, then, that Mr. Kitzes has been frequently excluded from giving expert testimony in various courts throughout the country.  Courts in at least 20 cases have excluded expert testimony provided by Mr. Kitzes.  Either his lack of specialized knowledge or the deficiencies in his methodology have led many courts, including this Court, to find his proffered testimony inadmissible.  With no education or training in PWC design or operation, or human factors engineering, Mr. Kitzes is not qualified to opine on the efficacy of on-product warning labels on the FZR or alternative warning systems.

**B.**     **Mr. Kitzes' Testimony Is Unreliable.**

Separate and apart from his lack of qualifications, there is no scientific methodology applied by Mr. Kitzes and there is no basis for the conclusions that Mr. Kitzes would like to reach.  His opinions are neither helpful to the jury, nor are they reliable.

To determine whether expert testimony is reliable, a court's inquiry must be focused on principles and methodology, not on the conclusions generated. *Crowley v. Chait*, 322 F. Supp. 2d 530, 535 (D.N.J. 2004). But conclusions and methodology are not completely distinct. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A court thus also examines the expert's conclusions to determine whether they can reliably flow from the facts known to the expert and the methodology used. *Heller v. Shaw*, 167 F.3d 146, 153 (3d Cir. 1999).

Courts consider several factors to determine whether an expert's methodology is reliable, including: (1) whether the method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247-48 (3d Cir. 2008). The inquiry is a flexible one and the list of factors is nonexclusive. *Crowley*, 322 F. Supp. 2d at 535. Still, there is nothing in the Rules of Evidence, *Daubert*, or its progeny that "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000). Expert testimony that concludes that warnings are deficient in placement, design, orientation, and content is unreliable if the expert has not created or even designed a warning device which would have been more appropriate or tested its effectiveness. *Ebenhoech v. Koppers Indus., Inc.*, 239 F. Supp. 2d 455, 468 (D.N.J. 2002).

Mr. Kitzes' testimony is not reliable because it lacks a basis in sound principles, evidence, and methodology.  He cites no basis for his opinions and, as mentioned earlier, he has done no work here, other than reading the depositions and other materials provided.  He did not gather consumer focus groups to determine the relative fluency of the label's format, or to assess the relative conspicuity of the label placed on the glove box door directly in front of the operator's position.  (Ex. 19, 21:14 to 22:15).  He did not consider a PWC rider's full interaction with the product, as opposed to the narrow point in time when the vessel is already in operation. (Ex. 10, at 21).  His baseless conclusions are precisely the *ipse dixit* excluded by our Courts. *Oddi*, 234 F.3d at 158.  An unsupportable gap exists between the conclusions Mr. Kitzes draws and the dearth of methodology employed to reach them.

Mr. Kitzes' conclusions, thus, do not logically flow from the application of sound principles, or the application of any principle at all.  His testimony is rank speculation that stands apart from the peer reviewed, widely accepted warning system that was thoroughly developed by experts in the PWC industry, regulators in the recreational boating field, and the organizations promulgating industry standards in 1999.  (See Ex. 10, at 14-15).  The Uniform Label developed through that process was accepted by the USCG and is widely used throughout the industry.  *Id.*

Mr. Kitzes' conclusions do not comport with the relevant standards.  With regard to coloration, he does not account for the fact that the relevant ANSI standard specifically contemplates the use of white lettering on a black background, and states no preference for black lettering on a white background.  (Ex. 10, at 22).  Either configuration provides the highest degree of contrast (black and white), which makes the label more legible.  *Id.*  Either alternative is acceptable pursuant to the governing standard.  *Id.*  And Mr. Kitzes offers no other evidence,

in either the relevant literature or industry practice, to establish a preference in warning labels or the human factors engineering field for black lettering on a white background.

His opinion that an additional warning needs to be placed in the middle of the seat is equally inapt.  To Mr. Kitzes, the Uniform Label in the front of the FZR, and the additional orifice injury warning at the rear are not enough.  He would require a third warning be placed about 14 inches from either of the two on-product labels, underneath the bodies of the operator and passenger once the vessel is boarded.  He offers no evidence regarding the relative likelihood of a PWC rider to read a warning label placed on the seat of the craft, as opposed to those on the glove box directly in front of the operator or above the aft deck (where passengers typically board the vessel).  (Ex. 10, at 21).  Mr. Kitzes' conclusion inappropriately focuses on a rider's ability to read a product warning after he or she has already boarded the PWC.  *Id.*  The proper focus is on a user's full range of expected interaction with the product; the time for a rider to read warnings is not after commencing operation of the PWC.  *Id.*

No law, standard, literature, or industry practice is cited in support of his opinion, as none exists; this renders his opinion baseless.  *Id.*; *see also Milanowicz v. Raymond Corp.*, 148 F. Supp. 2d 525, 533 (D.N.J. 2001).

Lacking any basis in sound principle or methodology, Mr. Kitzes' testimony is not reliable and should be excluded.

## IV.   Plaintiff Needs Expert Testimony.

To establish a strict products liability claim, a plaintiff must prove that the product was defective, the defect existed when the product left the hands of the defendant, the defect was the proximate cause of the plaintiff's damages, and the injured plaintiff was a reasonably foreseeable user.  *Tawil v. Ill. Tool Works, Inc.*, Civil Action No. 15-8747, 2016 WL 4260791 at *4 (D.N.J.

Aug. 11, 2016) (citing *Myrlak v. Port Auth. of N.Y. & N.J.*, 157 N.J. 84, 97 (1999)).  In a failure-to-warn claim, the defect consists of the absence of an adequate warning concerning the product's potential for injury, and the plaintiff must prove that the warning's absence was the proximate cause of the harm.  *Id.* (quoting *London v. Lederle Labs.*, 290 N.J. Super. 318, 327 (App. Div. 1996), *aff'd as modified by Batson v. Lederle Labs.*, 152 N.J. 14 (1997)).

Issues of product defect and causation usually require the introduction of expert testimony.  "The test of need of expert testimony is whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the party was reasonable."  *Butler v. Acme Markets, Inc.*, 89 N.J. 270, 283 (1982); *see also Rocco v. N.J. Transit Rail Operations, Inc.,* 330 N.J. Super. 320, 341 (App. Div. 2000).  In considering the need for a reliable expert opinion, the trial court should also determine "based on all the evidence presented, whether the knowledge and experience of the jurors, unaided by expert testimony, provides a sufficient basis to determine the factual issue . . . "  *Macri v. Ames McDonough Co.*, 211 N.J. Super. 636, 643 (App. Div. 1986).  New Jersey courts have repeatedly held that where the allegation of product involves a complex instrumentality, "a plaintiff is required to provide expert testimony."  *See Lauder v. Teaneck Volunteer Ambulance Corps*, 368 N.J. Super. 320, 331 (App. Div. 2004); *see also Huszar v. Greate Bay Hotel & Casino, Inc.*, 375 N.J. Super. 463 (App. Div. 2005); *Rocco*, 330 N.J. Super. at 341.  In a failure to warn case, "Expert testimony is generally needed as proof of an alternative warning and a reasonable alternative design to help the factfinder understand the mechanical intricacies of the instrumentality."  *Ebenhoech v. Koppers Ind., Inc.*, 239 F. Supp. 2d 455, 468 (D.N.J. 2002) (quoting *Rocco*, 330 N.J. Super. at 341).

24

Here, a qualified, reliable expert opinion is required.  The adequacy of the FZR's warnings system and the need for alternative warnings require application of specialized knowledge in human factors engineering.  The FZR is a jet-pump propelled watercraft with an internal rotating impeller driven by a combustion engine.  (Ex. 5, at 7-8).  Its Uniform Label was painstakingly and cooperatively developed by manufacturers, regulators, and standards organizations in the PWC industry.  The uniform warnings have been accepted by the USCG, and are widely used by manufacturers on their respective PWC products.  Without question, the FZR is a complex instrumentality, and qualified expert testimony is required to establish (1) that the product's warning system is defective and (2) to provide a reasonable alternative warning system, based on reliable principles and methodologies.  Plaintiff cannot prove a failure-to-warn claim absent admissible expert testimony to address these issues.

**V.    Summary Judgment is Appropriate Because Plaintiff Cannot Establish Her Failure-To-Warn Claim as a Matter of Law.**

    **A.    Plaintiff Lacks the Required Expert Testimony.**

Because Mr. Kitzes' testimony is unreliable and barred by *Daubert*, Plaintiff's failure-to-warn claim fails as a matter of law.  Where, as here, a plaintiff is required to submit expert testimony to establish an essential element of his or her case, the court may grant summary judgment if that testimony is excluded under *Daubert*.  *Kolokowski v. Crown Equip. Corp.*, No. 05-4257, 2009 WL 2857957 at *4 (D.N.J. Aug. 27, 2009) (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2001)).

Because Mr. Kitzes is not qualified to act as an expert and his opinions lack the requisite reliability, Plaintiff has no admissible expert testimony to prove her failure-to-warn claim.  Summary judgment should be entered in favor of YMUS.

**B.      The Baseless "Move-It-To-The-Seat" Argument Has Been Previously Rejected.**

In *Hickerson v. Yamaha Motor Corp., U.S.A.*, No. 8:13-cv-02311, 2016 WL 4123865 (D.S.C. July 29, 2016) a federal district court excluded a nearly identical theory involving a similar injury.  In *Hickerson*, the plaintiff's proposed expert opined that the same Uniform Label on a Yamaha WaveRunner contained acceptable language and acceptable solutions to the risk, but asserted that an additional orifice injury warning should have been placed on the PWC's seat. *Id.* at *1.  Like here, the expert had performed no research, no studies, and relied upon no other scientific evidence to support that theory.  The court noted that, as here, the Uniform Label had been vetted by the USCG and BSAC and was universally used throughout the PWC industry since 2001.  *Id.* at *5.  The court held the expert lacked any scientific basis to opine that the slight movement of location would make any difference.  *Id.*  The district court ruled that the expert's testimony was not reliable because it was not based on sufficient facts or data and it was not the product of reliable principles and methods under Evidence Rule 702.  *Id.*  Lacking admissible expert testimony to establish a defect in the product warnings, the district court granted the defendant's motion for summary judgment.  *Hickerson v. Yamaha Motor Corp., U.S.A.*, No. 8:13-cv-02311, 2016 WL 4367141 (D.S.C. Aug. 16, 2016).

The same reasoning applies here.  Because Kitzes' testimony, like the testimony in *Hickerson*, lacks any basis in data, sound principle, or methodology, it should be excluded, and summary judgment should be entered.

**C.      Plaintiff's Failure-To-Warn Claim Independently Fails Because Plaintiff and Mr. Fimple Ignored the Warnings.**

Plaintiff's failure-to-warn claim also fails because, regardless of the content or presentation of any warning system, Plaintiff and Mr. Fimple admit they did not read the warnings.  To prove strict products liability claim, a Plaintiff must show the product was

defective, the defect existed when the product left the hands of the defendant, and the defect caused the injury to a reasonably foreseeable user. *McGarvey v. G.I. Joe Septic Serv., Inc.*, 293 N.J. Super. 129, 142 (App. Div.), *certif. denied*, 147 N.J. 263 (1996).

Here, several warnings on the FZR and in the product literature and video expressly address the risk of an orifice injury. There is no dispute that the warnings provided with the PWC are understandable. Regarding the language of the warning, even Plaintiff's proposed expert concedes that "conceptually what they have is good." (Ex. 19, 73:19 to 74:2). There is no dispute that, had Plaintiff followed the many warnings provided on and with the product—that is, worn a wet suit bottom or equivalent protective clothing—she would not have sustained an injury.

Plaintiff testified she never read either the front or rear warning label on the PWC, and she never read the Owner's Manual prior to the accident. (Ex. 1, 49:13 to 50:7, 60:3-6, 73:8 to 79:18, 79:25 to 81:13). She does not claim that she never saw these labels with their bright orange banners and with "⚠ **WARNING**" in all caps emblazoned on top. (See Ex. 13). She simply does not recall whether she ever saw them or not. (Ex. 1, 55:25 to 57:11). Nor did Mr. Fimple make Plaintiff aware of any of the available safety information prior to the accident. (Ex. 1, 49:13 to 50:7, 73:12 to 79:18; 79:25 to 81:13; Ex. 2, 83:5 to 20, 87:25 to 91:17). Despite testifying that it was her habit to read product warnings, the thought never crossed Plaintiff's mind to read the warning labels before riding as a passenger on the FZR:

> Q. At any time, from the first time you saw Mr. Fimple's WaveRunner to the day of the accident – until the time of the accident, did it ever occur to you that, you know, maybe I ought to read the labels on this WaveRunner to see what these warnings are all about?
>
> A. No.

(Ex. 1, 71:25 to 72:7).

Mr. Fimple also testified that he never read the Owner's Manual or any other safety information for the FZR, and he did not read the warning labels on the FZR.  In fact, he never read the warning labels on any PWC he ever owned or operated.  (Ex. 2, 45:2 to 46:3).  He consciously ignored all PWC safety labels:  "And those warning labels, I just look at them and say that's something that I already probably know, and just kind of blow them off."  (Ex. 2, 45:7-46:3).  He also confirmed he never gave Plaintiff any of the available safety information.  (Ex. 2, 83:5 to 20, 87:25 to 91:17).  And, as further evidence of his disregard for the warnings, Mr. Fimple installed a decorative decal wrap on the FZR that covered all the on-product warnings except for the Uniform Label on the glove box.  (Ex. 2, 87:4-8; Ex. 5 at 3).

It thus did not matter what format was used for the warning label, or where it was placed on the PWC.  Both Plaintiff and Mr. Fimple chose not to read and follow the multiple warnings related to orifice injuries.  Plaintiff cannot prove that inadequate warnings proximately caused the damages where she chose not to read the warnings.  *McGarvey*, 293 N.J. Super. at 142.  YMUS is entitled to summary judgment on this independent ground.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant Yamaha Motor Corporation, U.S.A. respectfully requests that the Court exclude the opinions of William F. Kitzes, grant summary judgment and dismiss Plaintiff's claims with prejudice.

Dated: August 26, 2016                          Respectfully submitted,

<em>/s/ Robert A. Assuncao</em>

Robert A. Assuncao
James S. Coons
Kenneth A. Burden
**ANSA ASSUNCAO, LLP**
Two Tower Center Blvd., Suite 1600
East Brunswick, New Jersey 08816-1100
Telephone: (732) 993-9850
Facsimile: (732) 993-9851
robert.assuncao@ansalaw.com
james.coons@ansalaw.com
kenneth.burden@ansalaw.com

Richard A. Mueller, Esq. (*pro hac vice*)
**THOMPSON COBURN LLP**
One US Bank Plaza
St. Louis, Missouri 63101
T: (314) 552-6000
F: (314) 552-7000
rmueller@thompsoncoburn.com
*Attorneys for Defendant*
*Yamaha Motor Corporation, U.S.A.*