# Exhibit 19

Page 1

1            UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
2
3                    CASE # 1:15-cv-00049 (JBS)(KMW)
4
5    ANGELA RUGGIERIO,
6            Plaintiff,
7    vs.
8    YAMAHA MOTOR CORPORATION, U.S.A.,
     JOHN DOE(s) A-Z as manufacturer(s),
9    designer(s), and/or distributor(s)
     (fictitious name(s), i/j/s/a,
10
             Defendants.
11   _____/
12
13
                         Veritext
14                       301 NE 51st Street, Suite 1240
                         Boca Raton, Florida 33431
15                       Thursday, February 4 2016
                         9:00 a.m. - 11:00 a.m.
16
17
          DEPOSITION OF WILLIAM F. KITZES, J.D.
18                    Pages 1-88
19
20          Taken before Tambria Lee Dery, RPR, FPR,
21   Registered Professional Reporter, Florida
22   Professional Reporter and Notary Public in and for
23   the State of Florida at Large, pursuant to Notice of
24   Taking Deposition filed in the above cause.
25

Page 2

1   APPEARANCES:

2

3           GARY D. GINSBERG, ESQUIRE
            Ginsberg O'Connor, P.C.
4           Atrium II, 3000 Atrium Way, Suite 100
            Mount Laurel, New Jersey 08054
5           on behalf of the Plaintiff.

6

7           JOHN P. MUELLER, ESQUIRE
            ROBERT A. ASSUNCAO, ESQUIRE
8           Ansa Assuncao, LLP
            Two Tower Center Boulevard, Suite 1600
9           East Brunswick, NJ 08816
            on behalf of the Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page 12

1        A     Uh-huh, okay.

2        Q     So you have two pictures of that.  And

3    then you have a picture that looks like it was taken

4    just of the front handlebar that also shows the

5    uniform label, right?

6        A     Yes.

7        Q     Okay.  And I take it one of the things

8    that you're aware of is that there was a label, if

9    we look at the first copy, Page of Exhibit 6, there

10   was a label on the back of the watercraft that had

11   been covered up by his customizing job or customized

12   paint job or whatever?

13       A     It's indicated in the owner's manual,

14   right.

15       Q     It was indicated in the owner's manual

16   that there's a label there?

17       A     Yes.

18       Q     But in this photograph, it's been, it's

19   been covered up by his customizing job, right?

20       A     It appears that way.

21       Q     Okay.  And then you have -- oh, I'm sorry,

22   I should -- I stopped too early.  You actually have,

23   we'll add this in Exhibit 6.  It looks like you

24   have -- we'll just include them all.  You have seven

25   pictures of the product, right?

```
                                              Page 13
 1        A     Yes.
 2              (Defendants' Exhibit 7 was marked for
 3        identification.)
 4   BY MR. MUELLER:
 5        Q     And then you also, in Exhibit 7, you have,
 6   I guess, two kinds of Google Earth pictures, is that
 7   right?
 8        A     Yes.
 9        Q     Okay.  Would it be fair for me to assume
10   that you haven't been to the scene?
11        A     That would be fair.
12        Q     Okay.  And would it also be fair for me to
13   assume that you haven't, other than reading these
14   three depositions, you haven't talked to any of the
15   witnesses, Sal or Thimple or the Plaintiff?
16        A     That's correct.
17        Q     So the three depositions that you took
18   notes on in Exhibit 5, those are the only, as far as
19   factual information about the case, those are the
20   only, that's the only information you have; you
21   haven't tried to gather anything from interviewing
22   anybody or doing anything like that?
23        A     No, sir.
24              MR. MUELLER:  Okay.  Now, I'm going to
25        mark this as Exhibit 8.
```

```
                                            Page 14

  1              (Defendants' Exhibit 8 was marked for

  2         identification.)

  3  BY MR. MUELLER:

  4         Q     A draft warning, is that right?

  5         A     Yes, this is from the Columbo case.

  6         Q     The Columbo case was a case against BRP,

  7  right?

  8         A     Yes, sir.

  9         Q     Also in San Diego?

 10         A     Yes, sir.

 11         Q     We, I mentioned off the record, but you

 12  and I actually met twice in San Diego?

 13         A     And we met here, too.

 14         Q     But you were involved in another case

 15  against Yamaha in San Diego, the case that was tried

 16  twice, right?

 17         A     Yes.

 18         Q     And the Columbo case that you're referring

 19  to now, that case in San Diego, the Metcalf case,

 20  that wasn't an orifice injury, was it?

 21         A     No, sir.

 22         Q     The Columbo case was an orifice injury,

 23  was it not?

 24         A     Yes, sir.

 25         Q     And that was in San Diego against
```

Page 20

1   both of them, from your understanding of the facts

2   in the case, both of them have taken the position

3   that they did not read either the warning on the

4   front or the warning on the back that deals with

5   orifice injuries, correct?

6        A    Well, I'm not sure I would say they've

7   taken the position.  I think they testified that

8   they didn't read it.  I mean, Ms. Ruggierio said she

9   didn't see it, either the front and the back and

10  therefore, didn't read it.  Mr. Thimple said he knew

11  how to operate it and he didn't read it.

12       Q    Okay.  He didn't read the one on the front

13  or the back, right?

14       A    That's my understanding.

15       Q    Okay.  Now, in the photographs that you

16  have here as Exhibit 6, I guess we can agree that

17  even on the very front one, you can see the uniform

18  label from there?

19       A    Well, looking at it, knowing what I'm

20  looking for, I can see it, yeah.

21       Q    Okay.  Well, anybody can see that there's

22  an orange warning color-ish looking label in the

23  front of the craft immediately in front of where the

24  operator sits, right?

25       A    Well, I can't speak for anyone, but

there's a white lettering on black decal there, I agree with that.

Q With an orange color at the top, right?

A Yes.

Q And the orange color is a color that's typically used for warning signs, right?

A Yes, sir.

Q Okay. Let's see if we can -- other than the materials that you, that were either in the depositions or that were exhibits to the deposition, is there anything else as far as the facts of the case are concerned that you have done?

A No.

Q Okay. Have you done any work in this case, and I'm just trying to get kind of a structure of this, but have you done any work in this case that -- well, let me withdraw that question. You currently, you work out of your home, right?

A I do.

Q Okay. And so have you done any work in this case that actually required you to leave your home?

A My evaluation of the information, I could do that at home.

Q Okay. I mean, so -- I mean, when you sent

```
                                                 Page 22
 1    the bill to Mr. Ginsberg for four days' worth of
 2    work, this would be four days as far as your working
 3    is concerned, that you did in your house?
 4         A    In my office, yes.
 5         Q    In your house?
 6         A    In my office.
 7         Q    At your house?
 8         A    At my house.
 9         Q    Okay.  I'm trying to get a sense, you
10    didn't go out and conduct any tests, you didn't
11    gather up any consumer groups and say, hey, you
12    know, I want you to evaluate these warnings, you
13    haven't -- everything you did you did from reading
14    materials at your desk?
15         A    Yes.
16         Q    Okay.  And from that, I -- oh, let me see
17    if I can -- you've been testifying in litigation for
18    a good number of years, right?
19         A    I have.
20         Q    I mean, I didn't go through the normal
21    process you might do with witnesses, explaining what
22    depositions are and what the procedures are, because
23    you're familiar with that, right?
24         A    I am.
25         Q    Right.  I mean, so you know that you're
```

                                                      Page 23

1    under oath now and testifying with the same

2    obligations as if you were in a court of law and all

3    that stuff, right?

4         A    Absolutely.

5         Q    Okay.  And you have been testifying in

6    cases since roughly the early 1980s?

7         A    Early to mid '80s, yeah.

8         Q    Okay.  And I noticed, at least on the copy

9    of the case list that I had, it looks like you, in

10   the four-year time period on Exhibit, covered on

11   Exhibit 4A, you testified in 17 trials?

12        A    If that's what it adds up to, sure.

13        Q    Okay.  So I mean, you're talking about

14   something more than four times a year?

15        A    Approximately.  Some years, it's zero.

16   Some years, it's more.

17        Q    Well, I don't see any zero years on this

18   one, in this list.

19        A    Okay.

20        Q    And it looks like you've testified in, and

21   I counted this up before, but approximately 60

22   depositions, so roughly 15 depositions a year?

23        A    I'd say a little over one a month, yeah.

24        Q    And that's in addition to the trials,

25   right?

Page 25

1    communications, but yes, a wider array of specific
2    products.
3        Q    I mean, everything from hammers to saws to
4    trucks to cars to personal watercraft, planes, all
5    those, right?
6        A    I have to think about hammers, but the
7    other ones, yes.
8        Q    Okay.  You graduated from University of
9    Wisconsin?
10       A    I did.
11       Q    I guess you majored in political science?
12       A    History with a minor in political science.
13       Q    You then immediately after that, you went
14    to law school?
15       A    I did.
16       Q    American University?
17       A    Yes, sir.
18       Q    You got a Juris Doctorate degree?
19       A    I did.
20       Q    And that was in 1975?
21       A    Yes, sir.
22       Q    And that same year, you became a full-time
23    employee of the CPSC?
24       A    Full time, yes, sir.  Part time
25    previously.

Page 26

1      Q    And you left the CPSC in 1981?

2      A    I did.

3      Q    And at that time, you were I think a part

4   of the office of general counsel when you left?

5      A    The last year I was there, that's correct.

6      Q    The post college degree that you have,

7   Juris Doctorate is the only postcollege degree you

8   have, correct?

9      A    Correct.

10      Q    And after you left the CPSC in 1981, you

11   went to work for a guy by the name of Mr. Brenner?

12      A    Dr. Brenner.

13      Q    Who was a guy much as you do now, he

14   testified in cases mostly against car companies,

15   right?

16      A    Well, he had been chief scientist and

17   deputy director at the National Highway Traffic

18   Safety Administration and he started out in

19   government contract work, but yes, when I went to

20   work with him, he was doing litigation support.

21      Q    Against car companies, right?

22      A    Involving car companies, yes.

23      Q    Well, he was mostly testifying, as you do,

24   mostly on the Plaintiff's side?

25      A    That's correct.

```
 1        Q     And you worked for him for about two
 2   years?
 3        A     I did.
 4        Q     And then you started your own company?
 5        A     I did.
 6        Q     Which was Consumer's Safety -- I forgot
 7   the safety.  Consumer's Safety & Associates?
 8        A     No.  Consumer Safety Associates.
 9        Q     Consumer Safety Associates?
10        A     Correct.
11        Q     And that was a company owned by you and
12   your wife?
13        A     Yes.
14        Q     And it's still owned by you and your wife,
15   right?
16        A     Yes again.
17        Q     And you're a, for lack of a better word,
18   you're a one-man show, right?
19        A     I don't know quite how you mean that, but
20   I do the testifying and the safety analysis work.
21        Q     Well, how many employees does your company
22   have today?
23        A     Today, just my wife and myself.
24        Q     Okay.  And when you formed it, it was just
25   your wife and yourself, right?
```

```
                                          Page 28
 1        A     Yes.  I've had assistants over the years,
 2   but not since the kids moved out of the house.
 3        Q     Other than your children, I mean, you -- I
 4   mean, you're a sole proprietorship and the principal
 5   person that's employed there is you?
 6        A     No and yes.  We're an LLC.
 7        Q     Okay.
 8        A     But the principal employee is me.
 9        Q     Okay.  And the principal revenue generator
10   is you, right?
11        A     I couldn't do it without my wife, but I do
12   the billing, that's correct.
13        Q     All right.  Now, you have, over the years,
14   I take it, have had an opportunity to give
15   presentations to various bar groups?
16        A     A couple of times.
17        Q     Well, you gave -- a couple of times, you
18   gave a presentation to Kentucky trial lawyers,
19   right?  Twice.
20        A     Correct.
21        Q     In Texas?
22        A     Once.
23        Q     Maryland?
24        A     No.
25        Q     Not Maryland?  How many associations have
```

Page 29

1    you -- have I got that state wrong?

2         A    I think you mean Florida.

3         Q    Oh, maybe Florida, okay.  You used to be a

4    member of AVLO (phonetic), right?

5         A    And the ABA and the DC bar many, many,

6    many years ago.

7         Q    All right.  And you have given

8    presentations into the Plaintiff's bar on topics

9    about which you testified, for example, during the

10   ATV days, you talked about, you gave speeches, I

11   think one of your speeches was called The Hidden

12   Danger of ATVs or something like that, right?

13        A    That was the article I wrote for the World

14   Health Organization.

15        Q    And you gave speeches to the bar

16   association about ATVs, right?

17        A    I did as I did to the National Association

18   of Attorney's General and the International Consumer

19   Product Health & Safety Organization, yes.

20        Q    I mean, but this is part of your marketing

21   efforts, right?  I mean, when you go to the bar

22   associations, the Plaintiff's lawyers, like Mr.

23   Ginsberg, you give them a speech on, here are my

24   views about ATVs and here's the kind of case you

25   could make against ATVs and here are the points you

```
                                        Page 30
 1   could make about ATVs, right?
 2        A    Not exactly, number one.  Number two, I've
 3   never requested to give a speech to any of those
 4   organizations, it's always by invitation and to the
 5   best of my knowledge, I really haven't gotten any
 6   direct work from them.
 7        Q    Well, you gave a lot of speeches to the
 8   Plaintiff's lawyers about ATVs and you testified in
 9   an awful lot of ATV cases, didn't you?
10        A    Well, chicken and egg.  You know, I
11   gave --
12        Q    You can say so.  How about this --
13        A    Well, I testified in a lot of ATV cases
14   and then I was invited to talk about it.  I gave
15   many more speeches to non-bar groups than bar
16   groups.
17        Q    Well, you may or you may not.
18        A    No, no, I may.
19        Q    You may or you may not, but you did
20   testify in an awful lot of ATV cases, right?
21        A    Absolutely.
22        Q    And you gave speeches about ATVs to the
23   Plaintiff's lawyers, right?
24        A    Two or three times.
25        Q    All right.  You, what I recall from the
```

```
                                    Page 31
```

1   Metcalf case, you've ridden a personal watercraft

2   about three or four times, something like that?

3        A    That's about right.

4        Q    And I think most of that, if I'm recalling

5   your testimony, was in the '90s?  Well, let me just

6   ask this question this way, have you ridden personal

7   watercraft about three or four times?

8        A    That would be my recollection.

9        Q    And is it the case that the times that you

10  rode it, it was, I guess, other than one rental in

11  Florida, that most of this was case related; in

12  other words, you were riding it because you had a

13  case?

14       A    Recreationally, more than once and there

15  was one case that I recall where I rode one

16  specifically for the case.  That was the Ciagli

17  case.

18       Q    Okay.  So one was for a case.  And the

19  Ciagli case, was that an OTS case?

20       A    Yes.

21       Q    Okay.  Now, the other three times that you

22  rode, these were just recreational riding?

23       A    Yes.

24       Q    Okay.  Where did you, the three times, the

25  three times that were recreational riding, did you

```
                                             Page 32
 1   ride here in Florida?

 2        A    Yes.

 3        Q    Okay.  And were these -- you've never

 4   owned a personal watercraft, right?

 5        A    No, sir.

 6        Q    Okay.  The three times that you rode

 7   recreationally, was it, is my memory correct that

 8   this is all back in the '90s sometime?

 9        A    I don't know.  I mean, it could have been

10   the late '90s, it could have been 2000, you know,

11   I'd have to look and see when we went on vacation.

12        Q    Okay.  So -- but how about this, it was,

13   whenever it was, it was more than ten years ago?

14        A    I'd say that's probably true.

15        Q    Okay.  And the other three times, you're

16   saying you were on vacation?

17        A    Yes.

18        Q    Would you recall where you went on

19   vacation?

20        A    I would.

21        Q    Where?

22        A    Marco Island.

23        Q    In Florida?

24        A    Yes.

25        Q    That's always been a curiosity to me.  I
```

```
                                            Page 33
 1   always wondered where people in Southern California
 2   and people in Florida go to vacation, because it
 3   seems like you're in the place where everybody is
 4   going to on vacation.  So where do you go?
 5        A    You leave.  That's right.
 6        Q    You go to someplace else in Florida,
 7   apparently.
 8        A    You've got nice white, sandy beaches on
 9   the gulf side.
10        Q    Oh, okay.  I've never been to Marco
11   Island, but I guess it's a ritzy place?
12        A    No.
13        Q    No?  How about this, so you went to Marco
14   Island, I guess you probably went with your wife, is
15   that right?
16        A    Yes.
17        Q    Did you and your wife ride together?
18        A    Yes.
19        Q    Okay.  On all three times?
20        A    I don't know.  I remember specifically
21   riding with my wife once when we happened to come
22   across a school of dolphins, it was very nice.
23        Q    Okay.  And the other, were the other two
24   times, were you just riding by yourself?
25        A    I don't remember.
```

```
                                              Page 42
 1        A     Best of my recollection, yeah.
 2        Q     Okay.  Anything else?
 3        A     I think that covers it.
 4        Q     All right.  Now, so if I'm, conceptually,
 5    if I'm getting this correct, as far as orifice
 6    injury cases, you've had the Colombo versus BRP
 7    matter in San Diego?
 8        A     Right.
 9        Q     And Welch?
10        A     Right.
11        Q     And I guess this case?
12        A     Correct.
13        Q     That would be three of them?
14        A     Yes, sir.
15        Q     And that's, the Welch case you think was
16    in, it was in the early, mid 2001, something like
17    that?
18        A     Something like that.  I'm pretty sure that
19    the vehicle was pre uniform label.
20        Q     Right, the uniform label, just so when
21    we're talking, the uniform label was a label that
22    was drafted by Dr. Frantz, right or Frantz & Rhodes
23    or whatever the name of the company is?
24        A     Yes, on behalf of members of the PWIA.
25        Q     And it was, that was the uniform label
```

                                                    Page 43

 1     that was approved by the Coast Guard, BSAC and
 2     NASBLA, right?
 3          A    I don't know if I would use the word
 4     approved, but I would say that they reviewed it and
 5     it was accepted.
 6          Q    All of those organizations, that's to say,
 7     you know what BSAC is, right?
 8          A    Yes.
 9          Q    And you know what NASBLA is?
10          A    Yes.
11          Q    And the Coast Guard.  The Coast Guard is
12     the agency that has regulatory authority over
13     personal watercraft, right?
14          A    Correct.
15          Q    I mean, we talked about your, the years in
16     which you worked at the CPSC, but the CPSC has no
17     regulatory authority over personal watercrafts,
18     correct?
19          A    Correct.
20          Q    And the Coast Guard served on a panel that
21     reviewed the uniform label, right?
22          A    Not exactly.  They were provided with
23     copies as the work was ongoing.  I wouldn't say they
24     worked on the panel.
25          Q    All right.  Well, they -- and they made

```
                                         Page 44
 1    comments as the work was ongoing about what they
 2    wanted to see in the uniform label, right?
 3         A    Best of my recollection.
 4         Q    And they made -- and they're the ones that
 5    actually made the presentation to the Boating Safety
 6    Advisory Council about the uniform label; the Coast
 7    Guard made that presentation, right?
 8         A    Honestly, that I don't know.
 9         Q    Okay.  Have you read the minutes of the
10    BSAC meetings in which the label was approved?
11         A    Not recently, but I'm sure I looked at
12    them previously.
13         Q    Okay.  And the NASBLA presentations, do
14    you know who gave the presentation at NASBLA?  You
15    know what NASBLA stands for?
16         A    Yeah, the state and local boating agency.
17         Q    The National Association State Boating Law
18    Administrators, right?
19         A    Correct.
20         Q    That's to say every state has a guy who's
21    responsible for safe boating, right?
22         A    I'm sure they do.
23         Q    And those guys have an organization, so
24    all 50 states are represented in the NASBLA
25    organization, correct?
```

Page 47

1    the warning.

2        Q    Is your only criticism of these groups

3    that the approved the uniform label -- is your only

4    criticism of them the color and the location?

5        A    In this case, those are my two main

6    criticisms, yes.

7        Q    See, now you're hedging that.  I realize

8    that you have a law background, but see I asked

9    you -- I asked you a question, are your only

10   criticisms color and location.  When you answer by

11   saying, well, those are the main ones, see, that

12   means that no, they're not, I have some other

13   criticism besides that.

14       A    Well, those are my basic opinions.  As you

15   talk to me, I can't exclude that, you know, we'll

16   discuss things where I have other opinions, but the

17   unreasonable risk associated with this personal

18   watercraft is the failure to provide an adequate

19   warning in the location where it can be used by the

20   person who needs it.

21       Q    So is it, as far as your criticism of the

22   uniform label is concerned, is that you think that

23   in this case, it wasn't put in the right place?

24       A    Yes, that is a -- my criticism is that the

25   white on black format made it more difficult and

                                                      Page 48

1    less fluent as far as reading and comprehension is

2    concerned.  But --

3        Q    Those --

4             MR. GINSBERG:  Let him finish.

5             MR. MUELLER:  Go ahead.

6             THE WITNESS:  Those two things are my

7        criticisms.

8    BY MR. MUELLER:

9        Q    Okay.  You don't have any criticisms other

10   than that?

11       A    Well, only that they failed to do the

12   analysis necessary to understand where proper

13   placement was, but I think that's all tied up in the

14   same opinion.

15       Q    So we're clear, the two criticisms that

16   you're going to offer in this case are that the

17   uniform label is not in the right place and that its

18   color is such that it makes it less readable or

19   whatever words you used?

20       A    No, not that the uniform label is not in

21   the right place, the uniform label can stay where it

22   is.  It's my opinion that an additional label needed

23   to be placed on the seat in front of the passenger

24   so that they got directly the information they

25   needed to protect themselves.

                                              Page 49

1        Q    All right.  So I just want to make sure
2   I'm clear about the opinions in this case.  Your
3   opinions in this case, as far as the warning on the
4   product are concerned is that:  A, there should be
5   an additional -- the uniform label, as far as you're
6   concerned, is fine where it is, but you think there
7   should be an additional label about orifice injuries
8   and it should be located on the seat, right?
9        A    Or in front of the passenger.
10       Q    On the seat?
11       A    That would be the reasonable place, but I
12  want to just make sure that we say that it has to be
13  in front of the passenger.
14       Q    Do you have some other location in mind
15  other than the seat?
16       A    No.
17       Q    Okay.
18       A    But I'm just not limiting myself.
19       Q    I see.  All right.  And so that, as far as
20  the location issue is concerned for warnings, that's
21  your, that's your one opinion, that you think there
22  ought to be a warning, quote, "in front of the
23  passenger," best shot in your view would be on the
24  seat, right; and your second opinion is that you
25  think the uniform label is inadequate because the

Page 50

1   coloring, the black and white versus white on black
2   business, right?
3       A    Yes.  The fluency, the formatting.  I'm
4   not going to criticize the wording of the uniform
5   label, you know, but the way it's presented in
6   coloring, in spacing and whatever, mostly coloring,
7   I think it's less than adequate as far as
8   readability and fluency is concerned.
9       Q    Well, you know that, in fact, the uniform
10  label was actually presented to the Coast Guard
11  using this font and this size and these colors was
12  presented in the Frantz report, right?
13      A    No, I don't know that it was presented in
14  these colors.
15      Q    Oh.  You know that a uniform label was
16  presented to the Coast Guard that had font and had
17  colors and it's shown in the Frantz report, right?
18      A    I don't know about colors.  You know, I
19  know that it had an orange warning bar, but it was,
20  to my understanding, not presented in these colors.
21      Q    Well, when you say these colors, let's
22  look at Exhibit 6.  What -- when you say these
23  colors, what I see there is orange, black and white.
24  You're saying that the uniform label as presented to
25  the Coast Guard did not have black, white and orange

Page 51

1    on it?

2         A    Black background and white lettering?  Not

3    to the best of my knowledge.  If you could show me

4    someplace where it did, you know --

5         Q    Did it have black and white lettering,

6    whether it was black on white or white on black, did

7    it have black lettering?

8         A    I'm sure it had black on white.

9         Q    Okay.  And you are going to -- and you, in

10   your earlier answer, you said something like it's

11   well known that white on black is not as readable as

12   black on white.

13        A    I think so, yes.

14        Q    Okay.  So you, can you, in the -- I know

15   that you've brought here a series of articles.  As

16   far as the, and I'm -- that's in this folder that

17   you've handed me, can you cite to me in these

18   articles that you brought with you, which of these

19   articles says that black on white is different than

20   white on black as far as readability is concerned?

21        A    Not in those articles, but there's

22   documentation on fluency, on advertising that show

23   the difficulty in that format.  Some of the Yamaha

24   waverunners have a black lettering on white

25   background.

```
 1      Q    You're digressing.  A, can you cite in any
 2   of the articles that are a part of your file, a
 3   single article that says that there's a difference
 4   in readability between white on black versus black
 5   on white; yes or no?
 6      A    I'd have to go back and find the specific
 7   articles.
 8      Q    Well, these --
 9      A    Not in here.  These articles deal with
10   orifice injuries.
11      Q    So let's see if I can get an answer to my
12   question.
13           MR. GINSBERG:  He just did.
14   BY MR. MUELLER:
15      Q    If the file that you brought with you
16   today, you cannot cite an article that talks about
17   this readability issue that we've been discussing,
18   you didn't bring one with you, right?
19      A    Correct.
20      Q    Okay.  The second part you'd like to say
21   is that you think that there is an article that
22   would make the, would support the point or the
23   opinion that you're expressing that one versus the
24   other is more readable, right?
25      A    That's my recollection.
```

1     Q    Okay.  And can you tell me, then, what

2  that article is?

3     A    I have to go back and look.

4     Q    So you, if I were -- would it be fair to

5  say that as you sit here today, you can't name an

6  article that says white on black versus black on

7  white is more readable?

8     A    The one I recall is a book on advertising

9  by Richard Ogilvy, who was a -- from Ogilvy & Mather

10  who went through the various types of communication

11  and specifically said that white on black was not

12  as, I don't want to say communicable, because it's

13  not a disease, but not as appropriate for

14  legibility.

15     Q    Well, I'm trying to get the readability,

16  legibility part here.  I mean, so anyway, the only

17  article you recall as you sit here is something by

18  Ogilvy, some advertising thing, right?

19     A    That's the one I recall.

20     Q    Okay.  And I'm trying to get a sense of

21  what your pitch is.  You're saying -- I mean, if I

22  look at Exhibit 6 here and the picture that you have

23  of the uniform label, now, of course, because I'm

24  old, I have to wear reading glasses, but I can read

25  it.  Matter of fact, I just read it to you earlier.

```
                                               Page 54
 1              MR. GINSBERG:  You can't testify.
 2              THE WITNESS:  You're not that old.
 3              MR. GINSBERG:  Ask the question.
 4     BY MR. MUELLER:
 5         Q    Be careful now, because I'll bet you're
 6     probably what, maybe you're a year or two years
 7     older than me?
 8         A    How old are you?
 9         Q    Because you're 67?
10         A    Thanks, no, I'm 65.
11         Q    You're 65?
12         A    Yes.
13         Q    All right.  Then you're the same age as
14     me.
15         A    And we both can't read without our
16     glasses.  It's recommended against, when you ride a
17     waverunner, they recommend against wearing your
18     glasses.
19         Q    I read everything with glasses, that's a
20     function of age, not a function of the size of the
21     warning.  But I can read this and you can read it,
22     too, right?
23         A    Oh, if I sit here with my glasses on, it's
24     actually a little fuzzy to me, but if I got close
25     enough to it, I could read it, yeah.
```

Page 55

1      Q    Okay.  Now, your point about, about this

2    Exhibit 6 here is that if I were to switch these

3    colors and make this black on white, I'm still going

4    to be able to read it, right?

5      A    That's not what I said, but I think you

6    would still be able to read it holding it in your

7    hand in this conference room.

8      Q    Well, then what is the point you're trying

9    to make about black on white versus white on black,

10   you could read it in both cases, right?

11     A    Well, I didn't say it's not possible to

12   read it, I'm saying that it's less likely, you're

13   able to pick something out, when you're on a jet

14   ski, my recollection is that things happen quickly.

15   I'm not saying that it's not readable, that you

16   can't read it.  I'm saying that it's less likely, I

17   think, personal, technical scientific communications

18   opinion that it's less likely that you will be able

19   to read it quickly.

20     Q    You'll be able to read it quickly?

21     A    Yeah.

22     Q    All right.  But I guess would it be fair

23   to say that if you were taking the time to read it,

24   you could read it regardless of whether it's white

25   on black or black on white?

Page 56

1          A      Well, if someone has the eyesight to read

2     the fairly small font, but I'm not saying it's not

3     readable, without big glasses, because you're not

4     supposed to wear glasses on a jet ski, that it would

5     be readable, yes.

6          Q      In either case, right?

7          A      Depending on the person, yes.

8          Q      Okay.  Is there, other than -- I guess

9     what I'm trying to get at is as far as this second

10    opinion you have on the warning side as far as the

11    colors are concerned, I got the part that you're

12    saying that there ought to be a separate warning on

13    the location of the seat, but as far as these colors

14    are concerned, is the point that you're trying to

15    make here is that you think it's more likely to be

16    read by an ordinary consumer if it's a different

17    color?  It's not that you can't read it, you're just

18    saying it's more likely to be read?

19         A      I think that's true, it's more likely to

20    be able to be read.

21         Q      Well, what's the inability part?  We both

22    agree that you can read this.  If you take the time

23    and you're interested in acquiring some information,

24    you can read it regardless of what the color is,

25    right?

```
                                               Page 62

 1        Q    Okay.  And now, I know we've talked about

 2   this in other cases, but you -- well, A, in this

 3   case, you know that there's no, there is no design

 4   defect that's being asserted?

 5        A    I don't know whether or not the failure to

 6   warn is classified as a design defect, I don't know.

 7        Q    Okay.  But I mean, there are no, how about

 8   if I phrase it this way, as far as this case is

 9   concerned, you understand that there's no assertions

10   being made other than the failure to warn?

11        A    Well, I can't say I know that either.

12   What I can say is that I'm not aware of any

13   mechanical or performance issues of the vehicle.

14        Q    Well, you've testified in enough cases,

15   you know what a design defect is.  I mean, in the

16   cases that you've been involved in frequently, there

17   will be a guy who's an engineer who testifies that

18   he thinks that it's, you know, this design defect or

19   that design defect, right, you don't handle those

20   issues, but other people have in other cases that

21   you've been involved in, right?

22        A    Sure.

23        Q    Okay.  And you know there's no such expert

24   here?

25        A    Not that I'm aware of, but --
```

```
                                            Page 63
 1        Q    You know that you're the only expert
 2   that's been named by the Plaintiffs, right?
 3        A    I don't know that.
 4        Q    All right.  You haven't -- you haven't
 5   been told of any other experts, nor have you talked
 6   to any other experts on the Plaintiff's side?
 7        A    That would be true.
 8        Q    Okay.  And you don't -- I think that we've
 9   discussed this before, I mean, you're not -- we
10   identified the only postgraduate degree that you
11   have, correct, your law degree?
12        A    Correct.
13        Q    I mean, you have, you're not an engineer,
14   right?
15        A    No, sir.
16        Q    You are not an able architect?
17        A    No.
18        Q    You're not a boat designer?
19        A    No, sir.
20        Q    You don't have any degrees in any of those
21   fields, you're not an epidemiologist or things of
22   that kind, right?
23        A    I do a lot of work with epidemiology in
24   safety management, but I personally am not an
25   epidemiologist.
```

Page 64

1       Q    Okay.  And you may work with, you may have
2    worked in the past on other cases with people who
3    are engineers, but you're not an engineer yourself,
4    right?
5       A    That is correct.
6       Q    Okay.  So you're not going to be offering
7    any opinions, other than the two that you've
8    described, you're not offering any opinions on other
9    areas other than warnings in this case, correct?
10      A    Well, safety management and risk
11   assessment as they lead to the warning opinions, but
12   I'm not an engineer, I'm not going to talk about the
13   design of the boat.  I'm not going to talk about the
14   performance of the boat.  I'm here really to talk
15   about ultimately the labeling.
16      Q    Okay.  And the labeling opinions that you
17   intend to offer are just the ones we've already
18   discussed?
19      A    That's correct.
20      Q    And as you say on the issue of the colors,
21   there may be some sub-opinions on colors, but those
22   two topics are location and coloring, right?
23      A    Yes.
24      Q    Okay.  Now, moving on to the location --
25      A    Well, when you say coloring, you know, the

Page 65

1    white on black and, you know, the, as it says in the

2    ANSI standard in my report, some of the spacing of

3    the language, but that all goes to format.

4        Q    Well, okay.  I see what you're saying

5    there.  But I mean, are you -- is it -- are you

6    going to be expressing the view that when all these

7    organizations approved the Frantz label that had

8    this spacing, that you're saying that they got it

9    wrong; you have it right, they have it wrong?

10       A    I'm not going to comment on them at all.

11   I'm just going to say based on safety management and

12   communications, the use of additional spacing and

13   coloring assists in fluency and comprehension,

14   that's all.

15       Q    Well, let's just talk about the spacing.

16   Hypothetically, if the spacing in this label is

17   exactly the same as the spacing in the Frantz label

18   that was presented to the Coast Guard, are you going

19   to be saying that the Coast Guard, whose sole job it

20   is to regulate the safety of the personal watercraft

21   as it relates here, that the Coast Guard got it

22   wrong?

23           MR. GINSBERG:  Objection to the form of

24       the question.

25           THE WITNESS:  I'm not going to say

 1      anything about the Coast Guard.
 2   BY MR. MUELLER:
 3      Q    Is it your opinion that the Coast Guard
 4   got it wrong or did they get it right?
 5      A    I don't have an opinion about the Coast
 6   Guard.  I have an opinion about spacing.
 7      Q    And you know that the Coast Guard approved
 8   the spacing that you see here in Exhibit 6?
 9      A    No, I don't know that they did any such
10   thing, you know.  They accepted the labeling.  I
11   don't know if they thought that other spacing would
12   have been better.  I have no idea.  But I'm not
13   arguing with you that this was the label that was
14   ultimately presented, I'm just saying that I think
15   that under adequate warning's theory, the spacing
16   could have been better.
17      Q    Okay.  So you've got spacing, you've got
18   white on black/black on white issue.  As far as the,
19   under this heading of coloring that we've been
20   talking about, what other -- you've got -- what
21   other sub topics do we have?
22      A    None.
23      Q    Okay.  So it's just spacing and the white
24   on black, black on white topic, right?
25      A    Yes.

```
                                        Page 67
```

1        Q     Okay.  Then let's go to the second

2    opinion.  This is the location one.  What I

3    understand that you've told me thus far is that the

4    location of the uniform label on the product is fine

5    where it is, right?

6        A     If it's in conjunction with other

7    labeling, yes.

8        Q     We're going to get to that.  But as far as

9    where the uniform label that we see here in

10   Exhibit 6 and in your photographs, right there in

11   front of the operator, as far as that location is

12   concerned, you're fine with that?

13       A     If it's combined with another label.

14       Q     Correct.  So that you're not suggesting

15   that this label be moved from where it is?

16       A     No, I'm not.

17       Q     What you are suggesting is you think there

18   ought to be an additional label that just talks

19   about orifice injury, right?

20       A     Yes.

21       Q     And you think that that ought to be

22   preferably on the seat?

23       A     In front of the passenger.

24       Q     Well, the current label is in front of the

25   passenger.

Page 72

1   BY MR. MUELLER:

2       Q    If you change the material on the seat,

3   then your warning would be gone, right?

4       A    Unless the new seat material contained the

5   warning, but look, that's not a reason certainly not

6   to do it because somebody somewhere might change it.

7       Q    On the Yamaha craft, the warning on the

8   back says:  Severe internal injuries can occur if

9   water is forced into the body cavities as a result

10  of being near jet thrust nozzle.  Wear wet suit

11  bottoms or clothing that provides an equivalent

12  protection.  Is that the language that you would

13  like to see on the seat?

14      A    Well, that's the kind of language, yeah.

15      Q    Okay.  I mean, so I mean, from your

16  standpoint, this kind of a warning that I'm looking

17  at, Exhibit 9, the third page of Exhibit 9 which has

18  the label number 4, from the standpoint of the jury

19  understanding your proposal, what you would propose

20  to do is essentially have a label like that, but

21  have it -- instead of on the back of the craft, you

22  want it on the seat?

23           MR. GINSBERG:  Do you want to take a look

24       at the label?  He read it sort of quick.  Do

25       you need to look at it or are you good?

```
                                              Page 73
 1            THE WITNESS:  Well, that kind of language
 2        or the language that I appended to my report is
 3        the kind of language -- I mean, if this
 4        language was appropriately placed where it was
 5        clearly visible to the passenger, you know, I
 6        mean, I'm -- it might not be exactly the words
 7        that I would use, but the overall content is.
 8  BY MR. MUELLER:
 9        Q    How about, let me ask the question this
10  way, if Yamaha would take the warning that they
11  currently have on the back of the craft and put it
12  on the seat, would that solve your location
13  criticism in this case?
14        A    Well, like I say, I mean, close.  I mean,
15  I'm not sure I would use exactly the same language.
16  I might, you know, play with the words body cavity,
17  but the concept that they're addressing there is
18  what needs to be on the seat.
19        Q    Okay.  So I mean, but so you are or you
20  are not -- you would or you would not be critical if
21  that label I just read in Exhibit 6 were placed on
22  the seat, would you still be criticizing the
23  warnings in that regard or no?
24        A    I just answered the question.  I think
25  that conceptually what they have is good.  I might
```

Page 74

1    change a couple words, but other than that, that's

2    what people need to understand.

3         Q    Okay.  And you haven't tested any warnings

4    in this case, have you?

5         A    Tested like with a focus group?

6         Q    Yeah.

7         A    No.

8         Q    Okay.  I mean, so when you say you might

9    play with the, whether you use body cavities or not,

10   you haven't done anything to see whether using body

11   orifice as opposed to the word body cavity, whether

12   that makes any difference to consumers or not, you

13   haven't done any tests like that?

14        A    Well, there's some work done in the Frantz

15   report that, you know, addresses those things.

16        Q    I know that Mr. or Dr. Frantz did test the

17   warnings that we're talking about as a uniform

18   label, but what I was asking you is you, when you

19   say you might play with some words, you haven't done

20   any work here to say whether changing a word here or

21   there is really going to make any difference to the

22   ordinary consumer; in other words, you haven't taken

23   a focus group and had somebody say, oh, orifice is

24   much better than cavity?

25        A    I haven't, but I have to say that it's, to

Page 75

1    do it correctly and honestly, it's very difficult to

2    do.  You'd have to put people on jet skis and try

3    different wording and see what they see when they

4    sit on it.  But no, I haven't done it.

5         Q    You haven't done -- and you -- not only

6    have you not done that in this case, you haven't

7    done that in any personal watercraft case you've

8    ever been involved in?

9         A    No.

10        Q    No, you have not?

11        A    I have not.

12        Q    Okay.  I think I asked you some of these

13   questions before.  Currently, there are colleges

14   that offer either degrees or programs in safety

15   management, right?

16        A    Industrial safety management, yes.

17        Q    Okay.  But you don't have a degree in

18   that?

19        A    I've taken certificate programs from the

20   American Society of Safety Engineers and the

21   University of Michigan College of Engineering, but I

22   do not have another degree.

23        Q    You don't have a degree and you have not

24   attended any of those colleges that offer degrees

25   and you have not gone there and taken all of their

Page 76

1    classes, right?  In other words, I forget, there's

2    some university in Southern California that offers,

3    has a program in, a two-year program in safety

4    management.  You haven't gone and attended as a

5    student?

6         A    That's correct.

7         Q    Okay.  You're not a member of the SAE

8    group at all?

9         A    No.

10        Q    SAE, as you know, is the standards

11   organization for personal watercraft.

12        A    They write standards for personal

13   watercraft, yes.

14        Q    You've never attended any of those

15   meetings?

16        A    No.

17        Q    The Coast Guard, we talked about them,

18   they have a personal watercraft group that actually

19   goes around and makes factory tours and things of

20   that kind, you never met with or talked with anybody

21   there that's a part of that regulatory group?

22        A    No.

23        Q    Okay.  Do you know anybody at the United

24   States Coast Guard that works on personal

25   watercraft?

```
 1        A     Not personally, no.
 2        Q     Have you ever -- do you know what the NMMA
 3   is?
 4        A     The Marine Manufacturers Association.
 5        Q     Right.  Have you ever gone to any of their
 6   meetings?
 7        A     No, I get some of their publications at
 8   the ABYC and some of the others, but I haven't gone
 9   to the meetings.
10        Q     And ABYC, it's also a standard setting
11   organization for recreational boats, right?
12        A     Yes.
13        Q     They have a book, standards on
14   recreational boats, right?
15        A     Yes.
16        Q     You've never been to one of their
17   meetings?
18        A     No.
19        Q     Do you have a set of the ABYC book?  It's
20   kind of a dictionary size.  Do you have a set of
21   these standards in your office?
22        A     As needed, I do.
23        Q     What does as needed mean?
24        A     Well, if I need a standard, I get it.  But
25   I don't have the whole book.
```

1      Q    Okay.  Of the articles that you had in

2   your file that you brought with you here, which one

3   of those articles would you say -- I think I asked

4   you about the question about the color thing

5   already, so I want to know, cover the other opinions

6   that you had.  Do any of these articles here support

7   your position that there should be a supplemental

8   orifice injury warning?

9      A    No, those other articles are about

10  knowledge of orifice injuries in the community.

11     Q    Okay.  Well, I mean, I take it it would be

12  fair for us to agree that Yamaha presumably knew

13  about orifice injuries, because that's why they're

14  giving a warning, right?

15     A    I'd say they knew about it.

16     Q    Well, but they would have to know about it

17  in order to give a warning?  If they didn't know

18  about it, they couldn't give a warning.

19          MR. GINSBERG:  He just said, I'd say they

20      knew about it.

21          THE WITNESS:  Well, in order to --

22      knowledge is a requisite for determining what

23      needs to be warned against.

24  BY MR. MUELLER:

25     Q    Right.  I mean, you could -- as far as

1   Yamaha's knowledge of the risk of orifice injuries,

2   you could have looked at the warning and said, hey,

3   they must know about this because they're warning,

4   right?

5          A     That would be a solid first step, yeah.

6          Q     Okay.

7                MR. MUELLER:  Hold on, let's take a break.

8                (Brief recess.)

9   BY MR. MUELLER:

10         Q     Conceptually, here's the impression I'm

11  getting from what we discussed thus far.  You got

12  this, the materials that Mr. Ginsberg sent to you,

13  the depositions and so forth.  You had some stuff in

14  your office.  You read through those materials and

15  you wrote your report, right?

16         A     Yes, sir.

17         Q     Okay.  I mean, so it's not like you have

18  done any other types of work other than what I just

19  described?  And by types of work, I mean you didn't

20  go out and perform any calculations or go out and

21  ride a personal watercraft or -- I mean --

22         A     Well, I didn't do that specifically for

23  this case.  I didn't do any calculations.  I'm not

24  an engineer.  Like you said before, there's -- I'm

25  not aware of an allegation, as least as far as I'm

                                                           Page 80

1    concerned about a mechanical defect or something

2    else, so I evaluated the material, I've done, you

3    know, similar evaluations before and I've given you

4    my opinion.

5         Q    Yeah, no, but I mean, for example, like

6    when we were talking about Exhibit 6, would it be

7    fair for me to assume that you haven't actually seen

8    the subject watercraft in person as opposed to

9    looking at these pictures?

10        A    That would be fair.

11        Q    Okay.  And would it be fair for me to

12   assume that you have, you've not ridden, since I

13   guess we talked about your riding experience, you

14   haven't ridden on a craft in over a decade, from

15   what you've told me?

16        A    Something like that.

17        Q    Okay.  So would it be fair for me to

18   assume that you have not ever ridden on an FCR model

19   such as is involved in this case?

20        A    Certainly not a 2009.

21        Q    Well, you haven't ridden on any -- do you

22   know how long the FCR model has been around?

23        A    Not specifically.

24        Q    Okay.  Hypothetically, if in 2001, there

25   was no FCR model, you have, then that would mean

```
                                        Page 81
 1   that you have, since that was about, could have been
 2   the last time that you rode one, you haven't ridden
 3   on any FCR model or any personal watercraft after
 4   2001?
 5        A    Well, no, we said 2005.  This is 2015 or
 6   `16.
 7             MR. GINSBERG:  You said ten years.
 8             THE WITNESS:  The Welch case was 2001.
 9        But we said ten years, so if there was no FCR,
10        then I certainly didn't ride one.
11   BY MR. MUELLER:
12        Q    Okay.  But you didn't ride one for the
13   Welch case, you rode one for the Ciglia which was
14   back in the '90s, right?
15        A    Right.  I but I meant the other riding.
16        Q    The impression that I got was that you
17   haven't ridden a watercraft, ridden on a personal
18   watercraft since that Ciglia case, right?
19        A    No, that's what you said.
20        Q    When was the last riding experience you
21   had?
22        A    Some of the recreational riding was post
23   Ciglia.
24        Q    But it was in the '90s, right?
25        A    No.  You said that.  I said -- you said
```

```
                                           Page 82

 1   not for ten years and I said that's probably true.
 2        Q     All right.  So you -- you think that you
 3   rode sometime between 2000 and 2005, is that what
 4   you're saying?
 5        A     I don't know, but it's certainly possible.
 6        Q     All right, okay.  But if the FCR model was
 7   not around in 2005, then you've never ridden it?
 8        A     That would be correct.
 9        Q     And you don't know what models you rode
10   when you went down to Marco Island?
11        A     I don't.
12        Q     And you know that the FCR model is a high
13   end, it's one of the fastest watercraft of its day?
14        A     My understanding is that it's a high
15   performance vehicle.
16        Q     All right.  I mean, that's not the kind of
17   thing that people typically see at rental
18   operations, do they?
19        A     It's hard to say.  But generally, you
20   know, a renter doesn't go looking for a high
21   performance vehicle.
22        Q     Rental companies also are not buying the
23   high end, speedy models, are they?
24        A     I can't speak to them, but I wouldn't
25   think so.
```

1       Q    Okay.  All right.  And would it be fair

2   for me to say, then, do you recall any occasion in

3   which you've actually, other than looking at the

4   pictures in Exhibit 6, where you've actually seen an

5   FCR model say in operation?

6       A    I don't know.

7       Q    Okay.

8       A    Not that I specifically remember.

9       Q    Okay.  Have you ever seen one anywhere, I

10  mean, as part of the work you did in this case, did

11  you go by a dealership to try to see what an FCR

12  model looked like?

13      A    Nope.

14      Q    Okay.  So the only FCR model that you

15  think you've ever seen would be the ones in these

16  pictures that you see in Exhibit 6?

17      A    That's the only one that I know of for a

18  fact, yes.

19           (Defendants' Exhibit 11 was marked for

20      identification.)

21           MR. MUELLER:  Okay.  All right.  I think

22      that's it.

23           (Deposition concluded at approximately

24      11:00 o'clock a.m.)

25        (Signatures and Formalities were not waived.)

Page 84

1                    CERTIFICATE OF OATH

2

3      STATE OF FLORIDA          )

                                  :SS

4      COUNTY OF PALM BEACH)

5

6            I, the undersigned authority, certify that

7      WILLIAM KITZES, personally appeared before me and

8      was duly sworn.

9                    WITNESS my hand and official seal this

10     16th day of February, 2016.

11

12                    *Tambria Dery*

13

14                    TAMBRIA LEE DERY

15

16

17

18

19

20

21

22

23

24

25