IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ANGELA RUGGIERO,

               Plaintiff,

    v.

YAMAHA MOTOR CORPORATION,
U.S.A.,

               Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action No.
15-49 (JBS/KMW)

**OPINION**

APPEARANCES:

Gary David Ginsburg, Esq.
GINSBURG & O'CONNOR, P.C.
Atrium II
3000 Atrium Way, Suite 330
Mount Laurel, NJ 08054
    Attorney for Plaintiff

James Simon Coons, Esq.
Robert A. Assuncao, Esq.
ANSA ASSUNCAO LLP
Two Tower Center Blvd., Suite 1600
East Brunswick, NJ 08816
      -and-
Richard A. Mueller, Esq.
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, MO 63101
    Attorneys for Defendant

**SIMANDLE, Chief Judge:**

I.    **INTRODUCTION**

In this products liability action, Plaintiff Angela

Ruggiero (hereinafter, "Plaintiff") alleges that Defendant

Yamaha Motor Corporation, U.S.A. (hereinafter, "Defendant" or

"Yamaha") failed to provide adequate warnings when Plaintiff fell off a personal watercraft and sustained serious injuries. Defendant has moved to strike the reports and testimony of Plaintiff's expert William Kitzes, and asserts that without his report and testimony, Plaintiff has insufficient evidence for a reasonable jury to conclude Defendant is liable for a failure to warn claim.

For the reasons that follow, Defendant's motion to strike will be granted, and its motion for summary judgment will be denied.

## II.   BACKGROUND[1]

### A. Factual Background[2]

On June 30, 2012, Plaintiff suffered a severe rectal laceration when she fell off a 2009 Yamaha FZR WaveRunner personal watercraft ("FZR" or "PWC")[3] just off of Brigantine Township Beach. (Def. Statement of Material Facts at ¶¶ 1, 3.) Plaintiff's boyfriend, Thomas Fimple was the owner and operator of the FZR at the time of the incident, with Plaintiff holding on behind him as a passenger. (Id. at ¶ 2.)  As Mr. Fimple

---

[1] The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

[2] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to Plaintiff, as the party opposing summary judgment.

[3] The 2009 Yamaha FZR WaveRunner is a two-person, water jet-propelled, recreational boat. (Def. SMF at ¶ 16.)

approached the beach, he accelerated his FZR towards a large
boat producing a large wake. (Id. at ¶¶ 8-9.)  Contrary to his
usual practice of warning Plaintiff before he would accelerate
his FZR (so Plaintiff could hold on), in this instance, Mr.
Fimple did not advise Plaintiff that he was going to accelerate.
(Id. at ¶¶ 10-11; Ruggiero Dep. 48:24-25 – 49:1-4.)  As a
result, Plaintiff did not hold on, fell off the vessel, and hurt
her back. (Id. at ¶ 13.)  Plaintiff was wearing a two-piece
bathing suit when the incident occurred, as she was not wearing
a wetsuit bottom or other protective clothing at the time of her
injury. (Id. at ¶¶ 4-5.)

    Mr. Fimple purchased the FZR from Deptford Honda Yamaha on
July 19, 2009 and had owned it for nearly three years at the
time of the incident. (Id. at ¶ 15.)  Defendant, the wholesaler,
had originally sold the FZR to Deptford Honda Yamaha (Id.)
Prior to the accident, Mr. Fimple had modified the FZR in a
variety of ways to make it accelerate faster, while also
installing a decorative decal wrap that covered all the original
equipment warning labels on the FZR except for the Uniform Label
located on the glove box door below the handlebars. (Id. at ¶¶
16-17.)  When he purchased the FZR, Mr. Fimple received the
Owner's Manual, a Riding Practice Guide, a waterproof Riding
Instructions Placard, and a thick plastic Ziploc bag to store
the information. (Id. at ¶ 18.)

At the time of sale, Mr. Fimple's FZR had two warning labels affixed to the watercraft that specifically addressed the risk of orifice injuries and the need to wear protective clothing.  These labels were located on the handlebars (on the lid of the glove box) and at the rear of the craft (next to the rear boarding deck). (Id. at ¶ 22.)

The contents of these warning labels is not challenged by Plaintiff, only their placement on the watercraft.  The label on the glove box ("Uniform Label")[4] specifically stated:

> To reduce the risk of SEVERE INJURY or DEATH: . . . WEAR PROTECTIVE CLOTHING.  Severe internal injuries can occur if water is forced into body cavities as a result of falling into water or being near jet thrust nozzle. Normal swimwear does not adequately protect against forceful water entry into rectum or vagina. All riders must wear a wet suit bottom or clothing that provides equivalent protection (See Owners' Manual).

(Id. at ¶ 23.)  Plaintiff never read this label. (Kitzes Dep. 19:9.)  The second warning label, affixed behind the seats of the FZR above the boarding platform, states:

> Severe internal injuries can occur if water is forced into body cavities as a result of being near jet thrust nozzle. Wear a wetsuit bottom or clothing that provides equivalent protection. Do not board PWC if operator is applying throttle.

(Def. SMF at ¶ 27.)  Plaintiff testified she never read this label either because Mr. Fimple had covered it up with a decorative decal. (Kitzes Dep. 19:15-19.)  Furthermore, the

---

[4] The Uniform Label is used by every PWC manufacturer in the United States. (Def. SMF at ¶ 24.)

Owner's Manual instructs all riders to read the manual and warning labels before riding the PWC, and warnings about the potential risk of orifice injuries and the need to wear protective clothing are found on page 6, 7, 12, 61, 62, and 64 of the Owner's Manual. (Id. at ¶ 29-30.)

Plaintiff began riding as a passenger on Mr. Fimple's FZR in 2011, but Mr. Fimple never told her about the requirement to wear protective clothing as stated in the safety literature and on-product warnings that accompanied the FZR when he purchased it, nor did he ask her to review any of the materials or the on-product warnings on the craft, or to read the Owner's Manual. (Id. at ¶¶ 38-41.)  Plaintiff also never read any of the warnings on the FZR, nor did she read any warning (on the product, in the product literature, or otherwise) for the FZR that discussed the risk of orifice injuries and how to avoid the risk (by wearing protective clothing). (Id. at ¶¶ 45-47.)  In fact, Mr. Fimple has never reviewed the safety information for any PWC he has owned or used. (Id. at ¶ 51.)  Mr. Fimple first learned to operate a PWC in 1993, and explained that "[e]verything that I've been taught, I've been taught through my uncle, who was a boater, my grandfather, who was a boater, my aunt, who is a boater, their entire lives. So them teaching me physically how to properly do things, I didn't feel those warning labels would affect me at all because they've taught be

all the safety I needed to know . . . And those warning labels, I just look at them and say that's something that I already probably know, and just kind of blow them off." (Id. at ¶¶ 53, 58.)

### B. Procedural Background

Plaintiff filed her Complaint against Defendant in the Superior Court of New Jersey, Burlington County, on June 23, 2014. [Docket Item 1.]  Defendant properly removed the case to this Court under 28 U.S.C. § 1441(a). (Id.)  Plaintiff's Complaint consists of four counts: (1) strict products liability against Defendant for design defect and failure to warn; (2) negligence against Defendant for inadequate instructions and warnings for the FZR; (3) a strict products liability claim identical to the First Count but directed against fictitious individuals, and (4) a negligence claim identical to the Second Count but directed against fictitious individuals.[5]  After pretrial discovery, Defendant filed this motion for summary judgment [Docket Item 24], which has been fully briefed.  The Court held a Daubert hearing and oral argument on March 17, 2017. [Docket Item 31.]

---

[5] The parties agree that Plaintiff has now confined this action to a failure-to-warn theory only. (Opp'n at 18.)

III. **STANDARD OF REVIEW**

    C.    **Summary Judgment Standard, Generally**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Alabama v. North Carolina, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted); see also Fed. R. Civ. P. 56(a).

In evaluating Defendant's motion for summary judgment, the Court must view the material facts in the light most favorable to the non-moving party, Plaintiff, and make every reasonable inference in that party's favor. See Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). An inference based upon "'speculation or conjecture,'" however, "'does not create a material factual dispute sufficient to defeat summary judgment.'" Halsey, 750 F.3d at 287 (citations omitted). Rather, the non-moving party must support each essential element with concrete record evidence. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," the Court may grant summary judgment. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.  DISCUSSION

### A. Motion to Strike Expert Testimony of William Kitzes

The Court first addresses Defendant's motion to strike at the outset, as it impacts the outcome of Defendant's motion for summary judgment.[6]  In support of her theory of liability against Defendant, Plaintiff has produced the expert report, supplemental report and testimony of William F. Kitzes, J.D. (Pl. Statement of Additional Material Facts at ¶ 1.)  Mr. Kitzes testified at his deposition that he has offered testimony in approximately eight other cases involving personal watercraft in his career, with two involving orifice injuries. (Id. at ¶ 12.) He has opined about the location of the warning on Mr. Fimple's PWC, that "an additional [third] label needed to be placed on the seat in front of the passenger so that they got directly the information they needed to protect themselves." (Id. at ¶ 31.)[7] In Mr. Kitzes' view, this "failure to provide an adequate warning in the location where it can be used by the person who needs it" is creates an "unreasonable risk of catastrophic injury, particular to women, under foreseeable conditions well-

---

[6] The parties dispute whether expert testimony is actually needed in this case. See infra Part IV.B.

[7] Regarding the color of the warning, Mr. Kitzes has also opined that the safety warnings were inadequate because the Uniform Label on the glove box of the FZR uses white letters on a black background instead of black letters on a white background. (Ex. 19 to Def. Br. at 49:10 to 50:8.) Plaintiff withdrew this opinion at the Daubert hearing, so the Court will only address Mr. Kitzes' opinion regarding the location of the warning.

known to Yamaha for nearly 20 years." (Id. at ¶ 25; Kitzes Dep. 47:17-20.)  Plaintiff does not take issue with the actual wording of the two warnings on this watercraft, which are not at issue.

Defendant moves to exclude Mr. Kitzes' reports and testimony under Daubert v. Merrill Dow Pharma., Inc., 509 U.S. 579 (1993) because (a) he is not qualified to express the opinion that he offers, (b) his opinion is not reliable, (c) his "method" to derive these opinions is not scientific, and (d) his generic views about warnings are not helpful to the jury. (Def. Br. at 1.)[8]

Federal Rule of Evidence 702 "embodies a trilogy of restrictions on expert testimony: [1] qualification, [2] reliability, and [3] fit." Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994)); see also FED. R. EVID. 702.

### 1. Qualifications

Defendant first attacks Mr. Kitzes' qualifications as an expert in the present matter.  The qualification prong requires "that the witness possess specialized expertise." Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003).  The Third Circuit has

---

[8] An expert in a products liability case offered to testify regarding inadequate warnings must meet the Daubert criteria. Milanowicz v. Raymond Corp., 148 F. Supp. 2d 525, 541 (D.N.J. 2001).

"interpreted this requirement liberally," holding that "a broad range of knowledge, skills, and training qualify an expert as such." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). The basis of "specialized knowledge" can be from "practical experience as well as academic training and credentials." Kane Builders, Inc. v. Southern New Jersey Building Laborers Dist. Council, No., 2007 WL 2416470, at *6 (D.N.J. 2007) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir.1998)). The Third Circuit has interpreted the "specialized knowledge" requirement liberally, finding that "Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). "[I]f the expert meets the liberal, minimum qualifications then the level of the expert's expertise goes to credibility and weight, not admissibility." Kannankeril v. Terminix Int'l Inc., 128 F.3d 802, 809 (3d Cir. 1997).

Mr. Kitzes received his bachelor's degree in history with a minor in political science from the University of Wisconsin and his law degree from the American University Washington College of law. (Def. SMF at ¶¶ 59-61; Kitzes Dep. 25:8-18.)  After law school, he worked as an attorney at the Consumer Product Safety Commission, and after six years there, he joined the Institute for Safety Analysis as Vice President and General Manager. (Ex.

C. to Opp'n.) For the last thirty-four years, Mr. Kitzes has worked at Consumer Safety Associates, a consulting company he founded that includes himself and his wife. (Kitzes Dep. 27:21-23.) He has spoken at dozens of seminars and workshops on safety-related issues, and has written a wide range of articles on consumer product safety. (Ex. C to Opp'n.) Several manufacturers, including Dick's Sporting Goods and a large vending machine company, have hired Mr. Kitzes over the years to consult on product safety issues, specifically regarding the development of on-product warning labels. (Id.)

Despite his experience, Mr. Kitzes has no degrees in engineering, psychology, communications theory, or any science field, nor does he have a degree in industrial safety management. (Def. SMF at ¶¶ 61-62.) Furthermore, Mr. Kitzes has never owned a PWC, has only ridden a PWC four times in his life, has not ridden a PWC in over ten years, and has never ridden the FZR model WaveRunner. (Def. SMF ¶¶ 63-66.) He did not visit the accident location, nor did he inspect the subject FZR or an exemplar FZR. (Id. at ¶¶ 67-68.) He also did not personally speak with Plaintiff, Mr. Fimple, or Mr. Chiaradonna (Mr. Fimple's friend who accompanied them that day) to discuss the accident. (Id. at ¶ 70.)

Plaintiff claims that Mr. Kitzes is "eminently qualified to testify regarding products safety warnings based on the

11

knowledge, skill, and training he has acquired over the course of his 30 year career in safety management consulting," as he has "specialized expertise regarding products safety warnings based on his knowledge of safety management literature and standards and his years of work in consulting." (Opp'n at 24.) As such, he has knowledge that is superior to the average layman in regards to warnings.  On the other hand, Defendant argues that "[w]ith no education or training in PWC design or operation, or human factors engineering, Mr. Kitzes is not qualified to opine on the efficacy of on-product warning labels on the FZR or alternate warning systems." (Def. Br. at 20.)[9]

The Court finds that Mr. Kitzes has at least the minimum of education, training, and experience to testify about warning labels generally.  Despite the above deficiencies, exclusion of an expert witness on grounds of qualifications alone is "improper simply because an expert does not have the most appropriate degree of training." Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 495 (D.N.J. 2002) (citing Diaz v. Johnson Matthey, Inc., 893 F. Supp. 358, 372 (D.N.J. 1995)).  The fact that Mr. Kitzes is not a "human factors" expert does not mean that there is no "specialized knowledge" he can provide to

---

[9] Human factors engineering "is concerned with an evaluation of the human factors that are involved in the design and use of products, equipment, and facilities." Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316,  322 n.10 (3d Cir. 2003).

inform Plaintiff's allegations that the PWC warnings were inadequate due to their location on the PWC. See Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996)("[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."). Given the liberal construction of the qualifications of a putative expert under Daubert in the Third Circuit, see Yarchak, 208 F. Supp. 2d at 495 (observing same). Construing Mr. Kitzes' experience and education "liberally," his "generalized qualifications" satisfy the requirement of expertise for the purposes of this case – the location of warnings. See Paoli, 35 F.3d at 741.

## 2. Reliability of Methodology

Absence of a methodology, on the other hand, presents a grave problem. In arguing that Mr. Kitzes' reports and testimony must be excluded, Defendant maintains that Mr. Kitzes utilized no methodology whatsoever in producing his reports. The reliability prong inquiries whether the expert's conclusion rests upon "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589

(1993)); see also Kemly v. Werner Co., 151 F. Supp. 3d 496, 502 (D.N.J. 2015) (describing the same analytical framework); Krys v. Aaron, 112 F. Supp. 3d 181, 189-90 (D.N.J. 2015) (same).[10] "[T]he standard for determining reliability is not that high, even given the evidentiary gauntlet facing the proponent of expert testimony under Rule 702." In re TMI Litigation, 193 F.3d 613, 665 (3d Cir. 1999).  Reliability, however, does not require the proffering party to demonstrate the "correctness" of the expert opinion. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994) (concluding that the "evidentiary requirement of reliability" amounts to a lower burden "than the merits standard of correctness").  Indeed, so "long as an expert's scientific testimony rests upon good grounds ... it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." United States v.

---

[10] Where the reliability turns upon the intricacies of an expert's scientific technique, Daubert (and its progeny) directs courts to undertake an inquiry, in essence, into whether the disputed technique has gained acceptance in the relevant scientific community.  See In re Paoli, 35 F.3d at 742 n.8 (listing the relevant factors).  These "specific factors neither necessarily nor exclusively applies to all experts," Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); see also Kannakeril v. Terminix Int'l, Inc., 128 F.3d 802, 806-07 (3d Cir. 1997) (same)

14

Marshall, 365 F.3d 215, 244 (3d Cir. 2004) (citations omitted)(emphasis added).[11]

In certain circumstances, admissible expert testimony may derive from an expert's knowledge and experience. Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d Cir. 2000). Kumho addressed the applicability of Daubert to non-scientific experts. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999)  In non-scientific cases, such as here, the Daubert factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's expertise, and the subject of his testimony." Kumho, 526 U.S. at 150.  Thus, "the relevant reliability concerns may focus upon personal knowledge or experience." Id. at 152.  The objective of Daubert's gatekeeping role, however - "to ensure the reliability and relevancy of expert testimony" -  remains unchanged. Id.  In any case, the district court enjoys "considerable discretion" to "determine the criteria for judging reliability under the particular

---

[11] In assessing the reliability of an expert's methodology under Daubert, the trial court can consider various factors, including: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error, (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. In Re Paoli, 35 F.3d at 742.

circumstances." Betterbox Communications Ltd. v. BB

Technologies, Inc., 300 F.3d 325, 329 (3d Cir. 2002). "If the

witness is relying solely or primarily on experience, then the

witness must explain how that experience leads to the conclusion

reached, why that experience is a sufficient basis for the

opinion, and how that experience is reliably applied to the

facts." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid.

702.  However, as the Supreme Court observed in Daubert,

"vigorous cross-examination, presentation of contrary evidence,

and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but

admissible evidence." Daubert, 509 U.S. at 596.

Additionally, there are several additional "indicia of

reliability" that have particular relevance in a failure to warn

case such as this, including: (1) federal design and performance

standards; (2) standards established by independent

organizations; (3) relevant literature; (4) evidence of industry

practice; (5) product design and accident history; (6) whether

the expert uses illustrative charts and diagrams; (7) data from

scientific testing; (8) the feasibility of the suggested

modification, and (9) the risk-utility of the suggested

modification. <u>Milanowicz v. The Raymond Corp.</u>, 148 F. Supp. 2d 525, 532-536 (D.N.J. 2001).[12]

Defendant argues that Mr. Kitzes' testimony is not reliable because it lacks a basis in sound principles, evidence, and methodology.  Specifically, Defendant argues that Mr. Kitzes' "untested theory that a third orifice injury warning must be placed on the seat has no support in data or authoritative scientific literature or studies." (Reply Br. at 9.) Furthermore, Mr. Kitzes "offers no evidence regarding the relative likelihood of a PWC rider to read a warning label placed on the seat of the craft, as opposed to those on the glove box directly in front of the operator or above the aft deck." (Def. Br. at 22.)[13]

Plaintiff responds that Mr. Kitzes "cites to articles and medical literature establishing the chronology of when Yamaha first became aware of the potential for orifice injuries resulting from passengers falling off of personal watercraft,"

_____

[12] In addition to the general reliability criteria of <u>Daubert</u>, in a warnings case, where an expert proposes alternate warnings, he should at least either test the effectiveness of those warnings or point to contemporaneous industry practice. Otherwise, the reliability of the expert's testimony on the proposed warning is "extremely questionable." <u>Milanowicz</u>, 148 F. Supp. 2d at 541 (citation omitted).

[13] The Court also finds that Mr. Kitzes' testimony in <u>Colombo v. BRP US Inc.</u>, 230 Cal.App.4th 1442 (4th Dist. 2014) makes his opinion in this case unreliable.  There, defendant did not have a second on-product warning label on the rear of the craft, and Mr. Kitzes called having a label there "a superior location and it's a superior concept." (Ex. 2 to Reply Br.)

while he also cites "to the applicable . . . standards and criticiz[ing] YMUS based on their failure to comport with those standards." (Opp'n at 31-32.)  Mr. Kitzes bases his opinion on location of the warnings primarily on the voluntary American National Standards Institute (ANSI) Z535.4 Standard for Product Safety Signs and Labels.  Specifically, Section 9 of the ANSI Standards addresses sign and label placement. It states:

> 9.1 Location: Product safety signs and labels shall be placed such that they will: (1) be readily visible to the intended viewer and (2) alert the viewer to the potential hazard in time to take appropriate action.

(Kitzes Report at 14.)  Mr. Kitzes argues that Defendant's labeling on the PWC at issue fails to comply with this standard because the front label is not "readily visible to the intended viewer," here, the passenger, and the warning label on the aft portion beneath the seat may not be noticed by a passenger who mounts the PWC from the side, as Plaintiff did in this instance.

The Court finds that Mr. Kitzes' conclusion regarding the location of the warning is not based upon any sufficiently reliable methodology under Rule 702.  The problem with his conclusion is that in developing it, he failed to perform any tests or focus groups, take any measurements, rely on any articles on location of warnings (besides the very generalized ANSI standard itself), conduct any reenactments or even examine the PWC itself, leaving his conclusion to be, at best, an educated guess.  Speculation is not methodology. Completing any

18

of the above actions would have shed light on whether warning on

the seat would have made a difference in Ms. Ruggiero's conduct

on the day of the accident. (Kitzes Dep. 74:3-7.)[14]

    More specifically, Mr. Kitzes criticizes the placement of

two otherwise adequate warning labels on this small watercraft

by speculating that the passenger would not be able to notice

either of these labels during normal use.  The total distance

from the front handlebar (where the driver steers the PWC) to

the back of the passenger seat directly behind the driver is

only 39 inches.  The passenger typically rides by holding on to

the driver, sitting forward in the rear seat.  The passenger's

head is thus well less than 39 inches from the front warning

label.  With no measurements or reconstruction, it is guesswork

whether a passenger would be apt to notice the front label while

riding.  Similarly, Mr. Kitzes applied no methodology to support

his presumption that a passenger boarding from the side of the

craft would not see the front label or the rear label.  The rear

---

[14] Mr. Kitzes stated at the Daubert hearing that he did not need
to leave his house to have a reliable methodology for his
opinion, as he looked at photographs of the PWC to determine the
proper placement of the warning label.  But Defendant's expert,
Robert K. Taylor, P.E., in addition to reviewing the deposition
transcripts and photographs like Mr. Kitzes did, also completed
"on-water testing of an exemplar PWC, [reviewed] surrogate video
demonstrations with an exemplar PWC, inspect[ed] the subject PWC
and trailer, and inspect[ed] the launch sites used to launch the
subject PWC." (Taylor Report at 2.) Further, another one of
Defendant's experts, Kevin Breen, examined the subject PWC, the
incident site, and an exemplar PWC that he "utilized for various
operational and human factors evaluations." (Breen Report at 6.)

label is positioned where a passenger will see it when boarding from the water using the aft platform, and the seat support itself slants forward so that even a passenger getting on or off from the side may see the warning label from above the seat. Mr. Kitzes takes none of these physical facts into account in speculating that the rear label placement is not visible to a passenger.  Where the only criticism of Defendant's warning label system is the placement, rather than the content or prominence of the labels, the lack of an expert methodology for determining the adequacy of placement becomes a fatal shortcoming of the proffered opinion.

Moreover, Mr. Kitzes' opinions about the location of the warnings are based on examining one portion of a voluntary industry standard, as opposed to the peer-reviewed warning system (the Uniform Label) developed in 1999 by experts in the PWC industry, regulators in the recreational boating field, and the organizations promulgating industry standards. (Def. Br. at 22.)  Mr. Kitzes claims that no elaborate testing needed to be done here, but without any testing at all, his opinion is just speculation.  Mr. Kitzes' "methodology" of reviewing photographs and relying on a voluntary generalized industry standard that proclaims that warning labels should be placed where they are readily visible to the intended user does not pass muster under Daubert and Kumho.

20

In <u>Masterson v. BJ Stores</u>, No. 03-3202, 2007 WL 6560686
(D.N.J. Mar. 20, 2007), a failure to warn case involving a
plaintiff who injured herself riding a bodyboard, the Court
excluded Mr. Kitzes' testimony on reliability grounds because he
admitted that he "failed to test the effectiveness of such a
warning or point to industry practice at the time the bodyboard
was manufactured." (<u>Id.</u> at 14.)  As a result, the court held
that Mr. Kitzes' opinions were "extremely questionable" and not
reliable under <u>Daubert</u>.  The court explained that "Kitzes'
methodology would seem to only support his conclusions on how
[Defendant] should have performed and maintained a product
safety management program." (<u>Id.</u> at 16.); <u>see also</u> <u>S.S. Leatt
Corp.</u>, No. 12-483, 2013 WL 3714142, at *18 (N.D. Oh. July 15,
2013)("Even acknowledging that Kitzes has expertise in the field
of 'product safety management' and that such expertise is or
could be relevant to some issue or issues raised in the case,
there is insufficient information and analysis in Kitzes's
report to conclude that Kitzes employed a 'reliable' methodology
in reaching his 'conclusions' such that his opinions are
admissible.").  Similarly, here, Mr. Kitzes has not tested
whether a warning on the passenger seat would be more effective
than the warnings in the front and the rear, nor could he point

21

to any manufacturer who put a warning on the passenger seat at the time of the accident.[15]

The Court also finds Hickerson v. Yamaha Motor Corp., U.S.A., No. 13-2311, 2016 WL 4367141 (D.S.C. Aug. 16, 2016) to be persuasive regarding the reliability of Mr. Kitzes' "move-it-to-the-seat" opinion. There, in a similar fact pattern to the instant case, Plaintiff, wearing a two-piece bathing suit and not a wetsuit, rode as a passenger on a PWC and fell off, sustaining serious injuries. Hickerson, 2016 WL 4367141 at *1. There were two warnings on the PWC, one below the handlebars in front of the PWC's operator, and another toward the rear of the PWC, but Plaintiff did not read either warning. Id. Plaintiff brought a failure to warn suit against Yamaha, and supported her claim with expert testimony from Dr. Anand Kasbekar, who opined that "the warnings and instructions used by defendants are inadequate and insufficient given the potential for extremely serious injuries." Id. at *3. Dr. Kasbekar proposed that an additional warning should have been placed on the passenger seat, but the court excluded his testimony "due to its

---

[15] Plaintiff points out that the recently-released 2016 Kawasaki Jet Ski has a label on the passenger seat, which demonstrates feasibility. (Opp'n at 36-37; Reply Br. at 8.) But the court in Masterson held that "[o]n its own, the warning that post-dates the purchases of the bodyboard at issue here cannot be relied upon to demonstrate what [Defendant] knew or should have known the year prior." Masterson, 2007 WL 6560686 at 15. As a result, Mr. Kitzes cannot rely on the Kawasaki design as part of his methodology in this case, as it is not relevant.

unreliability under the standards of Fed. R. Evid. 702," since he had "not tested his proposed alternative warning system," and that "he provides no specific relevant research or studies . . . on which he relies." Id.

Defendant argues that here, as in Hickerson, Mr. Kitzes' theory that a third warning of the need to wear protective bottoms to prevent orifice injury must be placed on the seat has no support in data or authoritative scientific literature or studies. (Reply Br. at 9.)  Plaintiff argues that Hickerson is inapposite because that court's ruling on the admissibility of expert testimony "actually supports" Plaintiff's position since the court found Dr. Kasbekar "qualified as an expert" and that unlike Dr. Kasbekar, Mr. Kitzes "has authored many warnings from start to finish that would be ready to be placed on a product and has written a peer reviewed article on warnings." (Opp'n at 41-42, 44).  Here, while Mr. Kitzes relies on an ANSI standard to opine on the placement of the warning location, he has failed to articulate his methodology supporting how he arrived at the conclusion that a passenger seat warning is "readily visible" under the standard, and how the existing front and rear warning system falls short.  He provides no reason why his conclusion is not simply ipse dixit.  As a result, the Court finds that Mr. Kitzes' reports and testimony are unreliable.  While the

analysis could stop here, for the sake of completeness, the "fit" prong is <u>Daubert</u> is briefly examined below.

### 3. Fit

Finally, the "fit" requirement is based upon the text of Rule 702, which requires that an "expert's scientific, technical or other specialized knowledge . . . help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  To be helpful, expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." <u>United States v. Schiff</u>, 602 F.3d 152, 173 (3d Cir. 2010)(quotation marks and citation omitted).  Conversely, "expert evidence which does not relate to an issue in the case is not helpful." <u>United States v. Ford</u>, 481 F.3d 215, 219 n.6 (3d Cir. 2007) (quotation marks and citation omitted). "The standard is not that high, 'but is higher than bare relevance.'" <u>Schiff</u>, 602 F.3d at 173 (citation omitted).

Plaintiff argues that Mr. Kitzes' report and testimony "succinctly informs" where Defendant "has fallen short in its attempt to warn the public, and female passengers in particular, about the potential for these horrific injuries"; as a result, Mr. Kitzes' testimony "will assist the trier of fact in understanding plaintiff's position that the orifice warning needs to be conspicuous and on the seat where a passenger such as Ms. Ruggiero has an opportunity to read it and heed its

message."(Opp'n at 38.)  But Mr. Kitzes' testimony focuses more on the general industry standards and the history of such standards, and is not sufficiently tied to the facts of this case, i.e., whether or not Ms. Ruggiero would have seen this passenger seat warning, as well as why the Defendant's labeling system would not have been "readily visible" to a passenger, as the ANSI standard states.  Mr. Kitzes' opinion that the labels are not visible to the passenger is not grounded to the actual watercraft at issue here, which he never examined or measured. Mr. Kitzes' proposed testimony simply does not fit the actual warning label system in this case.  A lay juror would be in as good, or perhaps better, position to determine this issue of fact, aided by actual measurements or observations, of the PWC at trial, as discussed in Part IV.B, below.

For all of these reasons, Yamaha's motion to exclude Mr. Kitzes's opinion on admissibility grounds under Federal Rule of Evidence 702 will be granted.

### B. Need of Expert Testimony

Plaintiff argues that even without Mr. Kitzes' testimony, she can still prove her claim of failure to warn because the allegations of negligence against Defendant are "simple" and a "juror who possesses average judgment and experience does not need expert testimony to understand that a warning on a product must be conspicuous and must be placed in a location where the

25

user of the product intended to be warned can see it." (Opp'n at
40.)  On the other hand, Defendant argues that the FZR is a
complex instrumentality and that the "adequacy of the FZR's
warnings system and the need for alternative warnings require
application of specialized knowledge in human factors
engineering, the use, operation, and transportation of the PWC,
the development and testing of the Uniform Label, and applicable
warning standards, all of which are beyond the ken of an average
juror." (Reply Br. at 9.)  The Court tends to agree with
Plaintiff, as now discussed.

A plaintiff may prove the existence of a product defect by
relying on the testimony of an expert, or alternatively, a
plaintiff may proffer circumstantial evidence of a defect,
including use, handling, and operation of the product. Lauder v.
Teaneck Volunteer Ambulance Corps., 368 N.J. Super 320, 331 (App
Div. 2004).  However, expert testimony is required in a warning
defect case where the subject matter "falls outside of the
common knowledge of the factfinder and depends on scientific,
technical, or other specialized knowledge." Jerista v. Murray,
883 A.2d 350, 364 (N.J. 2005); see also Butler v. Acme Mkts.,
Inc., 445 A.3d 1141, 1147 (N.J. 1982) (stating that expert
testimony is necessary where "the matter to be dealt with is so
esoteric that jurors of common judgment and experience cannot
form a valid judgment"); Macri v. Ames McDonough Co., 211 N.J.

Super. 636, 642 (App. Div. 1986) (requiring expert testimony where subject matter is such that jurors of common judgment and experience cannot "make a determination without the benefit of the information and opinions possessed by a person with specialized knowledge"). Where an "average juror can deduce what happened without resort to scientific or technical knowledge, expert testimony is not mandated." Jerista, 883 A.2d at 365.

The Court finds that Plaintiff can proceed without expert testimony in this case. While the PWC itself is certainly a complex instrumentality, here, given that the contents of the warnings are not at issue, it is not necessarily beyond the common knowledge of an average juror to determine whether the placements of the warnings were reasonably visible to a passenger using the PWC. The jury can observe at trial what warnings are visible on the PWC and what warnings are not, and Plaintiff can utilize eyewitness testimony. The limited issue of visibility therefore does not require expert testimony. This does not preclude Defendant from offering such testimony of qualified experts who have used a reliable methodology pertaining to this PWC or a prototype thereof.

## C. Summary Judgment is Not Appropriate

Defendant argues that Plaintiff's failure-to-warn claim independently fails on summary judgment because Plaintiff cannot

prove that inadequate warnings proximately caused the damages where she chose not to read the warnings. (Def. Br. at 28.) Plaintiff responds that what is actually relevant is "what plaintiff would have done if she saw and read a label warning of the potential for orifice injuries prior to this accident." (Opp'n at 47.)

A cause of action for failure to warn is governed by the New Jersey Products Liability Act ("PLA"), N.J.S.A. 2A:58C-1 et seq.[16]  Under Section 2 of the PLA, a plaintiff can prove that a product was defective if:

> the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it . . . failed to contain adequate warnings or instructions.

Id. at 2A:58C-2.  In a failure-to-warn claim, the defect consists of the absence of an adequate warning concerning the product's potential for injury, and the plaintiff must prove that the warning's absence was the proximate cause of the harm. Coffman v. Keene Corp., 628 A.2d 710, 716 (N.J. 1993).  A manufacturer is not liable, however, where an adequate warning is provided. N.J.S.A. 2A:58C-4; London v. Lederle Labs., 290 N.J. Super. 318, 327 (App. Div. 1996).

---

[16] This statutory standard for determining the adequacy of a product safety warning is essentially a codification of the common law standard. Grier v. Cochran W. Corp., 308 N.J. Super. 308, 317 (App Div. 1998).

## 1. Adequate Warning

The PLA provides that "[i]n any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction or, in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product leaves its control, if the manufacturer or seller provides an adequate warning or instruction. N.J.S.A. 2A:58C-4.  An adequate warning is defined as "one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger . . . taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used." Id.; see also Port Auth. of N.Y. and N.J. v. Arcadian Corp., 189 F.3d 305, 319 (3d Cir. 1999) (noting that the adequacy of the warning is determined in part by "taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used"); Repola v. Morbark Indus., Inc., 934 F.2d 483, 491 (3d Cir. 1991) (explaining that the PLA "adopts an objective negligence standard in defining an adequate warnings")(citations omitted). Warnings may be included in printed materials packaged with the product or on labels affixed to the product.  They may be in words or pictures, and "pictorial symbols, rather than simply

29

words, may be required to adequately convey safety warnings to some anticipated users." <u>Levey v. Yamaha Motor Corp.,</u> 361 N.J. Super. 312, 318 (App. Div. 2003).  The form they take is dictated by all of the circumstances, and the adequacy of the chosen form is generally a question for the jury. <u>Id.</u>; <u>see Perlman v. Virtua Health, Inc.</u>, No. 01-651, 2005 WL 1038953, at *4 (D.N.J. May 3, 2005)(explaining that the adequacy of a product warning is a jury question); <u>Grier v. Cochran Western Corp.</u>, 308 N.J. Super 308, 317 (App Div. 1998)(same).

    The Court finds that that there is a genuine dispute of material fact as to whether or not the two existing warnings on the PWC were adequate.  Plaintiff testified that she did not read the front warning and "wasn't aware" of its existence under the handlebar. (Ruggiero Dep. 56:9-16.)  She also testified that she never read the warning on the back of the PWC prior to or after her injury.[17] (<u>Id.</u> 62:8-17.)  Furthermore, Plaintiff testified that she has never operated a PWC, that she has only been a passenger every time she has ridden a PWC, and that when she boarded the day of the accident, Mr. Fimple was already on the vessel. (<u>Id.</u> at 31:6-21; 46:7-14.)  Plaintiff also never sat on the PWC alone. (<u>Id.</u> at 45:10-11.)  Plaintiff also points to the testimony of Defendant's expert Robert K. Taylor, P.E., who

---

[17] The parties dispute whether Plaintiff actually saw or should have seen the front and rear warnings, which cannot be resolved on this summary judgment motion.

stated that "I would agree that once a passenger is seated on the craft behind the operator, it would be difficult to read a label in front of the handlebars or at the stern underneath the grabhandle." (Ex. F. to Opp'n at 27.)[18]  Mr. Taylor, when asked if "when the passenger sits down that label may well be blocked by the operator," replied "[a]t that particular point in time that may be true." (Taylor Dep. at 52:7-15.)  Certainly whether a displayed warning would catch the attention of a reasonably prudent passenger would contribute to the warning adequacy analysis.  As explained infra, the jury will be able to look at, in a common sense way, whether the warnings were visible and in a location where a reasonably typical passenger could see them.

### 2. Proximate Causation

Regarding causation, Defendant argues that even assuming its warnings were inadequate, its warnings were not the proximate cause of Plaintiff's injury.  In failure to warn cases, New Jersey has adopted a rebuttable "heeding presumption," affording a plaintiff "the use of the presumption that he or she would have followed an adequate warning had one been provided." Coffman v. Keene Corp., 133 N.J. 581, 603 (1993); see also Mohr v. Yamaha Motor Co., Ltd., 2013 WL 3762719

---

[18] Mr. Taylor also opined that "[t]he appropriate time to learn of potential hazards and protective measures is well before you are seated on the PWC and engaged in riding." (Ex. F. to Opp'n at 27.)

(App. Div. 2013).[19]  When the claim is a failure to warn, the
heeding presumption applies to shift the burden of production of
evidence to the defendant. <u>Coffman</u>, 133 N.J. at 603.  The
defendant must come forward with evidence such as "the
plaintiff's knowledge of the very risk that the absent warning
was supposed to address," or of "plaintiff's attitudes and
conduct apart from knowledge of the product's risk . . . ."
<u>Sharpe v. Bestop</u>, 314 N.J. Super. 54, 74 (App. Div. 1998); <u>see
also id.</u> at 77 (noting that it is "consistent with our evidence
rules" that a defendant "may only introduce rebuttal evidence of
a plaintiff's failure to heed warnings if such evidence rises to
the level of habit or routine practice").

        At the outset, the Court has found no case in New Jersey
(or applying New Jersey law) where the heeding presumption was
utilized when there was already an existing warning on the
product, let alone two warnings, as in this case.  But assuming
that the court adopts the heeding presumption, Defendant has
offered evidence, from Plaintiff's deposition, where Plaintiff
states that it never occurred to her that she ought to have read

---

[19] The heeding presumption "serves to reinforce the basic duty to
warn – to encourage manufacturers to produce safer products, and
to alert users of the hazards arising from the use of those
products through effective warnings." <u>Coffman</u>, 133 N.J. at 599.
As one court has explained, "the heeding presumption was adopted
for the express purpose of making a plaintiff's burden less
onerous on the issue of proximate cause with respect to a
product warning." <u>Perlman</u>, 2005 WL 1038953, at *5.

the labels on the PWC to see what the warnings were about.
(Ruggiero Dep. 71:25 – 72:7).  Defendant argues that Plaintiff
cannot establish proximate causation and the heeding presumption
is therefore rebutted because neither Plaintiff nor Mr. Fimple
read, or ever thought they should read, any of the warning
labels on the PWC. (Id.; Fimple Dep. 45:7 to 46:3.)  In other
words, Defendant contends there is no evidence that had there
been a warning on the passenger seat, that Plaintiff would have
read and heeded it. See Coffman, 133 N.J. at 602-03; see also
Hickerson, 2016 WL 4367141, at *4-*5 ("[T]he plain language of
the multiple warnings, both near the front and rear part of the
PWC . . . reasonably advise anyone who rides the PWC, including
a passenger, of the very types of dangers Plaintiff endured and
moreover provides specific recommendations to prevent such
injuries . . . the evidence does not clearly support that a more
adequate warning would have mattered anyway—that is, that the
inadequate warnings caused her injuries.").

     However, Plaintiff, upon being asked the question: "[a]nd,
was it your habit, before June of 2012, that when you saw there
was a sign that said warning, that you would read those
instructions so you can see exactly what it was that either the
manufacturer of the product or the company or the people who
placed that warning in there was trying to convey to you,"
responded that "[she] would look at it." (Ruggiero Dep. 54:7-

16.)[20]   Further, she testified that she "wasn't aware" of the
warning label in the front of the PWC, and presumably was not
aware of the warning label in the back because Mr. Fimple
covered it with a decal. (Id. at 56:13-16.)   There is no
evidence in the record that Ms. Ruggiero was aware of the risks
of using a PWC, and there is no evidence that she ignored any
warnings. Compare Scrofani v. Stihl Inc., 44 F. App'x 559, 563
(3d Cir. 2002) (affirming the entry of summary judgment for
defendant because plaintiff "acted in direct contravention of
numerous warnings contained therein" and that "[t]his disregard
of existing warnings demonstrates that [plaintiff] would have
ignored the most perfect of warnings"); Hickerson, 2016 WL
4367141, at *5 (noting that "the evidence does not clearly
support that a more adequate warning would have mattered
anyway"). As a result, the Court finds that after a review of
Defendant's rebuttal evidence, reasonable minds could differ as

---

[20] Additionally, the following exchange occurred during
Plaintiff's deposition:

> Q: Is it your habit – or was it your habit before June
> 30th, 2012, to read warnings and follow them?
>
> A: If I see a warning, I read it.
>
> Q: And follow it?
>
> A: I follow it, just like I wear a seat belt every
> day when I drive.

(Ruggiero Dep. 142:12-18).

34

Case 1:15-cv-00049-JBS-KMW   Document 32   Filed 03/31/17   Page 35 of 35 PageID: 1078

to whether an adequate warning, if given, would have been read and heeded by the plaintiff.  At the very least, this presents the jury an opportunity to conclude that Plaintiff would have, in response to an adequate warning, done something differently. Thus, a genuine issue of material fact remains for trial.

**V.   CONCLUSION**

In sum, Defendant's motion to strike the reports and proposed testimony of William Kitzes will be granted, and Defendant's motion for summary judgment will be denied.  The accompanying Order will be entered.


**March 31, 2017**                          **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            Chief U.S. District Judge